CADILLAC MOTOR CAR CO. et al. v. AUSTIN.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1915.)

No. 2766.

1. PATENTS ⊂⇒165—CONSTRUCTION OF CLAIMS.
    An element which expressly characterizes and limits one claim of a patent, and by which alone it substantially differs from another claim, will not be read into the latter, when not necessary to make it operative.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. ⊂⇒165.]

2. PATENTS ⊂⇒328—VALIDITY AND INFRINGEMENT—CHANGE-SPEED GEARING.
    The Austin patent, No. 1,091,618, for change-speed gearing for automobiles, was not anticipated, and discloses invention, the device being the first practically operative two-speed axle drive gearing; also held infringed as to claims 9 to 12, inclusive.

3. PATENTS ⊂⇒26—INVENTION—NEW COMBINATION OF OLD ELEMENTS.
    If the selection of elements from existing machines into a complete combination has, for the first time, produced from a practical and commercial aspect, a new result, invention may well be predicated thereon.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. ⊂⇒26.
    Patentability of combinations of old elements as dependent on results attained, see note to National Tube Co. v. Aiken, 91 C. C. A. 123.]

4. PATENTS ⊂⇒168—CONSTRUCTION OF CLAIMS—AMENDMENT OF APPLICATION.
    That the claims of a patent as granted were introduced by a voluntary amendment, and are broader than those in the original application, does not deprive the patentee of the right to have them construed as broadly as their language implies, nor of the right to hold as an infringer one who, with knowledge of the original claims, built a structure which avoided them, but which is within the broader claims.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½, 244; Dec. Dig. ⊂⇒168.]

Appeal from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Suit in equity by Walter S. Austin against the Cadillac Motor Car Company and others. Decree for complainant, and defendants appeal. Affirmed.

Infringement suit by Austin against the Cadillac Company, based upon claims 9, 10, 11, and 12, of patent No. 1,091,618 for "change-speed gearing," issued to Austin March 31, 1914, on application filed August 12, 1913, in renewal of application filed February 16, 1911. From the usual interlocutory decree for injunction and accounting, the Cadillac Company appeals.

The specification classifies the invention as relating to change-speed gearing, "especially adapted to automobiles." In the common form of this machine, the engine crank shaft, running longitudinally of the car, is clutch-connected to a propeller shaft, extending back in the same axial line into bevel-gear engagement with the rear axle, which is thus driven, and which drives

the car. In the simplest form of clutch connection between engine shaft and propeller shaft, the two must always revolve at the same speed. In transmitting the power from the propeller shaft to the axle through the bevel gearing, it is obvious that the relative speeds of driving shaft and driven axle can be determined by adopting any desired ratio between the number of teeth on the driving shaft-carried pinion as compared with the number on the driven axle-carried gear. To illustrate: It may be assumed that, for ordinary speed on average roads, the best ratio is 3 to 1—that is, three times as many teeth upon the axle gear as upon the shaft pinion—and it will follow that for each shaft revolution the wheels will make one-third of a revolution. It is clear that no such permanent or fixed relation, "direct drive," between engine speed and axle speed will meet the varying conditions of service; and so it has been common to interrupt the propeller shaft by interposing between its front and rear severed portions selective transmission devices, whereby the relation between the speeds of engine and of propeller shaft may be varied. A short parallel countershaft, carrying gears of different sizes, corresponding gears upon the propeller shaft, and means for sliding some of these gears longitudinally, or, perhaps for using none, of them and clutching the two parts of the shaft directly to each other, enable the operator to select the ratio which he prefers; and if, for example, he selects a ratio of 4 to 1 in his transmission, and has a ratio of 3 to 1 in his direct drive, he will have an effective final ratio of 12 to 1, as between his engine and his driven axle, resulting in the so-called "low speed." It is obvious, too, that this indirect method of transmission, by breaking the continuity of the propeller shaft and interposing gearing, is less desirable than if the driving power comes directly from engine to axle, and so it is commonly understood that the direct drive or the "high speed" is to be preferred wherever conditions permit. It was Austin's idea to increase the flexibility of this direct drive by providing alternative gear pairs between shaft and axle and by providing selective mechanism, whereby the driver can cause one of two driving pinions on his shaft to drive either one of two beveled gears upon the axle, whereby, for example, the driver may shift the connection from one to the other and change the gear ratio from 3 to 1 to 2 to 1, so causing a complete revolution of the wheels to each two revolutions of the engine shaft, and increasing the speed of the car 50 per cent. without changing the speed of the engine. The very considerable practical advantages of this result are conceded, although there are disadvantages, and the ultimate balance will not necessarily and always be favorable. Such favorable net result, which will make the idea practically worth while, was to be attained only by exercising either a high degree of skill or a considerable amount of invention, as the two may be classified, in minimizing the bad and emphasizing the good among the attendant conditions.

What Austin did was to provide, at the rear end of his propeller shaft, a small bevel pinion fixed thereon and to carry just forward thereof another and larger bevel pinion fixed to a sleeve surrounding the driving shaft. In front of this sleeve the shaft carried a longitudinally sliding clutch, splined upon and always revolving with the shaft, but capable of being engaged with or disengaged from the pinion-carrying sleeve. It resulted that while the smaller pinion would always revolve with the shaft, the larger one would or would not, according as it was clutched thereto or unclutched\therefrom. These two pinions were always in mesh with the corresponding bevel gears on the differential housing (thus ultimately revolving the axle), the forward pinion and the outside gear having the high, or 2 to 1, ratio, and the rear pinion and the inside gear having the low, or 3 to 1, ratio. Since it is clear that both gear pairs could not be clutched to and fast upon shaft and axle, respectively, at the same time without stripping some of the gears, and since when Austin's clutch pinion was fast to the shaft, both pinions thereon must revolve, he made the inner or low-speed gear loose upon the axle, and provided a clutch sliding longitudinally on the axle and always revolving therewith, but engaging the inner gear to the axle only when desired. He then connected his clutch on the shaft and his clutch on the axle by toggle levers so that they automatically acted together, and when one was thrown in, the other was thereby necessarily thrown out. It followed that if the forward pinion on the shaft was made fast thereto, it would drive the outer gear and so drive

the axle, but while the rear pinion would also drive the inner gear, the latter would be free from the axle and would run idle thereon. If the forward pinion was unclutched from the shaft, the inner gear would be driven by the rear pinion, and the inner gear being then fast to the axle, it would cause the outer gear also to revolve, this, in turn, would drive the forward pinion, and the latter, being free from the shaft, would run idle thereon. It therefore resulted that, of the four gear members, three were always fast and one always idle.

The defendant's device employs the same two gear pairs; that is, two driving pinions on a propeller shaft, and two driven gears upon the axle. The four gear members have the same relative form, size, mounting, and arrangement as in Austin's, in all particulars except one; the smaller and rear (being the low-speed) driving pinion, instead of being fixed on the propeller shaft, is carried upon a sleeve concentric therewith, and which may be clutched thereto, and the other member of the pair, the inner or low-speed driven gear, is fixed to the axle instead of being clutch-connected thereto. In other words, the high-speed gear pair is wholly the same in both machines and the low-speed gear pair is the same, excepting that the capacity of being detached from its shaft is transposed from one member to the other. Of the four gear members, three are always fast and active, one always loose and idle.

The case presents the questions whether the claims in suit can properly be so read as to cover defendant's device, and, if so, whether they are valid. Claim 10 may fairly be considered typical of the group sued upon, and it reads as follows: "In a change-speed gearing for automobiles, the combination of the axle, differential gearing, and a suitable housing, an outer driven beveled gear secured to said housing and an inner driven beveled gear nested with the outer beveled gear, either one or the other of which is adapted to be connected to drive the differential gearing structure to operate the said axle, a propeller shaft, a bearing for the inner end thereof, an inner pinion thereon adapted to mesh with the inner driven beveled gear, and an outer pinion concentric therewith adapted to mesh with the outer beveled gear, the outer gear and pinion being of higher ratio than the inner gear and pinion, and means for coupling either the outer beveled gear and pinion, or the inner beveled gear and pinion to said propeller shaft to drive the said axle, co-operating for the purpose specified."

F. P. Fish, of Boston, Mass., for appellants.
F. L. Chappell, of Kalamazoo, Mich., for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] 1. Defendant insists that whatever invention Austin made extended only to the relative arrangement of his clutched and fixed gear members, and hence that his patent must be confined to a device carrying one clutched driving pinion and one clutched driven gear, with connections whereby the two clutches have an in and out automatic action. We cannot so interpret claim 10. Its language is not incapable of such a limitation, when it is read in connection with the specification; but when we compare the various claims, including those not in suit, we find that this particular clutch construction and arrangement are expressly specified in, and seem to be the dominant thought of, another group of claims, while not mentioned in the group of claims in suit. This comparison clearly shows that the latter were intended to be distinguished and characterized by the provision that the outer gear and pinion were of higher ratio than the inner gear and pinion.

It follows that, under the familiar rule which we have several times followed and applied (Scaife v. Falls City Co., 209 Fed. 210, 214, 126 C. C. A. 304; National Co. v. Mark, 216 Fed. 507, 521, 133 C. C. A. 13), we will not read into one claim elements which expressly char-acterize another, by which alone the two substantially differ and which are not necessary to make the former operative; and that if Austin's only real invention resided in his peculiar clutch mechanism, claim 10 would be void, because broader than the invention.

2. If the words of claim 10 are given quite ordinary and normal meanings, the claim clearly reads upon defendant's device, which has all the parts named, and in their specified, mutual relationship. Its slid-ing clutch, engaging one or the other of the pinions and so driving one or the other of the fixed gears, fully responds to the phrase—

"means for coupling either the outer beveled gear and pinion or the inner beveled gear and pinion to the said propeller shaft to drive the said axle."

Aside from the contention that the special clutch arrangement should be read in, only two questions of failure to respond to the terms of the claim are raised. One is whether the defendant's inner driven beveled gear is "nested" with the outer beveled gear. This word "nest-ed" is not of very precise meaning. In Austin, the outer surface of the inner gear ring rests, in part, against the inner surface of the outer ring; in the Cadillac, both rings are supported upon and carried by the same back frame, though the two are not in actual contact; but in each case, looked at from the face side, there is no appreciable an-nular space between the two gears, and the face plane of the inner gear projects beyond the outer just about half of the thickness of the ring. From the face side, the difference between the two devices is not noticeable; and the word "nested" is not inapt to describe the relations between the two gears and their respective supports, as found in the Cadillac structure. The other suggestion is that in the Cadillac, the inner driving pinion is not "on" the shaft ("an inner pinion there-on") because it is not integral with the shaft, as in Austin, or car-ried solely thereby. It surrounds the shaft, revolves with or upon the shaft, and would be carried thereby and would operate if it had no other support, but through its surrounding outer pinion and frame bearings external thereto, it would be kept in place if the shaft were removed. We find no reason for giving to "thereon" so limited a meaning as defendant's contention requires, and we must think that the mechanism of the claim is used by defendant.

[2] 3. These considerations lead us to conclude that the vital ques-tion is whether, construing the claim as we do and considering what others had already done, there was invention in the combination claim-ed. In deciding this question, one fact stands out as important, and, we think, controlling. This fact is that, although it was common me-chanical knowledge that with constant speed in a driving shaft, the speed of a right-angled driven shaft could be changed by providing two pairs of driving pinions and driven gears and clutching one or the other pair to the shaft, and although certain advantages to be de-

rived from employing this principle upon an automobile were very apparent, and although numerous skilled engineers and inventors had tried for many years to accomplish this result in a commercially useful way, Austin was the first man who practically succeeded and who built a marketable automobile with a two-speed axle.[1] The strongest evidence of the lack of any prior practically operative device and of Austin's success is furnished by the defendant's conduct. There are, in the record, a number of earlier patents illustrating various conceptions of an automobile axle having two or more speeds; there is no affirmative evidence that any of them ever came upon the market. The Cadillac Company had long been among the leaders in the industry; its skilled engineers, who testified as witnesses in this case, doubtless thoroughly knew the practical art and its history the world over, and their admission that Austin's two-speed axle was the first one they had ever seen practical enough to impress them favorably, and their failure to say they ever heard of any other on the market, are evidence enough that there was no such predecessor. Of course, if any one of these earlier patents disclosed Austin's complete combination, it would be of little or no importance that they never came into use; but the rule is quite different when the issue is whether modifications and rearrangements amount to invention.

Some apparent instances of earlier adoption of this idea in practice turn out to be exceptions that emphasize Austin's real priority. Defendant's chief engineer testifies that two or three "two-speed axles" built into automobiles had been demonstrated to him by other inventors in an effort to interest him and his company, and that he had been taken to ride in automobiles so equipped; and while his testimony implies that they worked well enough, neither he nor his company was attracted by these devices, or paid any further attention to them, and the devices dropped out of sight. On the contrary, after the Cadillac Company had thus "turned down" such devices and had considered and discarded various designs and plans for a two-speed axle, and after Austin had kept one or more of his in use for a year or so, he exhibited it at the Chicago show, in January, 1913. Defendant's chief engineer saw it there, was attracted by it, and at once procured Austin to ship him an axle for trial. This was built into a Cadillac car and used for a time. The company negotiated with Austin for the right to use his invention, but apparently became satisfied both that his royalty demands were exorbitant, and that he would not, upon his pending application, secure a patent broad enough to be of very much value. It thereupon returned his axle and declined further to consider a contract with him. However, it immediately modified some theretofore discarded two-speed axle designs so as to put the device in the form which we have described as "defendant's device," put this upon all its cars for the annual season then beginning, and extensively advertised its two-speed axle as the greatest advance in the automobile art made by any manufacturer in any country. Indeed, it exploited an inter-

[1] Austin is himself an automobile manufacturer, and his machines, containing the invention, have been made and sold, though in limited number.

national award made to it as depending partly upon this ground.[2] It may not be clear that, as compared with the prior art, Austin made any new invention, but it is quite clear that, as compared with the prior art plus Austin, defendant's engineers did not; and it follows that their advertising claims go far toward crediting Austin with an epoch-making invention. This kind of advertising does not demonstrate anything; but unless the defendant was acting in bad faith— which should not be presumed—it shows that defendant's present insistence on the trifling character of what Austin did is an afterthought. In such a situation, the courts must be very reluctant to say that the step in advance taken by the patentee was only mechanical skill.

The French patent to the Minerve Company, dated in 1904, presents, perhaps, the closest approximation to the Cadillac structure. Indeed, defendant insists that the Minerve device is the prototype of defendant's; and it would go without saying that if in fact defendant has followed the Minerve disclosure with only those changes and adjustments obvious to the skilled automobile mechanic, or if the same construction of claim 10 of the Austin patent necessary to make it read upon the Cadillac will also cause it to read upon the Minerve, the claim is not valid. A careful study of this French patent so becomes necessary. It had a four-speed axle, and was intended to provide, by this mechanism alone, all the necessary variety of speeds. At the rear end of its propeller shaft, it carried four concentric sleeves, each of which, at its rear end, carried a beveled gear constituting a driving pinion. The pinion gear faces were approximately in the same vertical plane, whereby it resulted that each of the three outer pinion gears was dished partly or wholly around the next within. A so-called sleeve upon the axle carried fixed thereon four-beveled gears. Each was carried upon an independent disc, spider, or other frame, and these were spaced well apart along the sleeve. Each gear meshed with the corresponding sleeve-carried pinion. A sliding clutch on the shaft fastened thereto any one of the four pinion sleeves, leaving the other three to be driven idle. The gears on the axle sleeve were of substantially the same diameter. From this construction, it followed that the outside gear pair had the highest ratio, resulting in high speed in the axle, while the innermost pair resulted in low speed. The drawing indicates that the ratios, commencing at the inside, were approximately, 4 to 1, 2 to 1, 1½ to 1 and 1⅕ to 1. We have already stated the reasons why it is to be presumed that this Minerve device never came into use. In addition, it is pointed out that a ratio as low as 12 to 1 is necessary to meet common conditions, and that, if the Minerve was built so as to give that ratio, and with the smallest practicable driving pinion, the driven gear must have such a radius that the gear

---

[2] "Public attention is focusing upon one car, and especially upon a principle in that car which distinguishes it from other cars. This car is, as you will surmise, the Cadillac; and the principle is its two-speed direct drive axle. Partly because of that principle, the Cadillac rides differently, and, it is said more luxuriously than most other cars. * * * The qualities which won the Dewar Trophy * * * are peculiar in the Cadillac. They flow out of Cadillac standardization, Cadillac methods, Cadillac ideals, and the Cadillac two-speed direct drive axle."

case would drag on the ground. Other defects are pointed out, which, it is said, would prevent practical and successful use; but it is not clear just how far such defects may be due to an imperfect drawing [3] or might be remedied by fairly skillful construction.

Defendant says if we throw away either the outer two or the inner two of the Minerve gear pairs, we have the Cadillac construction. This is, superficially and broadly, true; but more exact comparison shows three elements specified in the combination of Austin's claim 10 and found in defendant's structure, which are not in the Minerve. These are: (1) In Austin and in the Cadillac, the outer driven gear is seated directly on the differential housing. This gives a broad and rigid support, and it is carried into the claim by the words "secured to said housing." In Minerve, the gear nearest the part which may be the housing it at a considerable distance away, and there is no direct connection. The axle sleeve on which the gear frame is centrally mounted does by its revolution ultimately drive the axle and the differential gears; but the patent does not indicate how this is done, nor indeed is it clear that the drawing shows any revolving differential housing. The gear is thus unsupported for the greater part of its diameter, and more free to vibrate. We cannot be sure that it is "secured to the differential housing" within Austin's contemplation. (2) In Austin and in the Cadillac, the inner driven gear is "nested" in the outer. Even in the rather narrow sense that the inner gear ring is partly withdrawn inside of the plane of the face of the outer ring, and that the outer furnishes a rigidity of support to the inner, either by rather direct contact, as in Austin, or because the supporting frame of one merges into that of the other, as in the Cadillac; in no such sense are the Minerve gears "nested." They lie in wholly independent planes, and neither as to 1 and 2 or 3 and 4 does the outer furnish any support to the inner. Their only connection is through their common axis. (3) In Austin, as in the Cadillac, the rear end of the continuous propeller shaft rests in a bearing carried by the rear axle structure, thus tending to maintain the perfect respective positioning of the driving pinions and driven gears. This is made an element of the claim by the words "a bearing for the inner end" of the shaft. In Minerve, the outer pinion sleeve is carried in a fixed bearing, each sleeve closely surrounds and supports the one next within it, and when the shaft and inner sleeve are not clutched together, the shaft finds its bearing therein. The differences between carrying the shaft end in this complex structure, with four bearing surfaces between it and the frame, and carrying it directly in the frame are obvious and may be important.

It is not necessary to decide just how closely Austin should be limited to his form of each one of these three elements. It is enough to say that, as to each, he departs from Minerve to some extent, and that, to the full extent of his departure, the Cadillac does the same, both as to each of these three and as to the combination of the three with each other, and as to the combination of the three with all the

---

[3] For example, the clutch shown in the drawing could not be passed from one sleeve to the next without engaging both at once. This at least indicates that the drawing was not made from a working device.

other named elements of the claim. This complete construction was taken from Austin, and it is not, in its entirety, to be found elsewhere.

In addition to these differences between Minerve and Austin, the two were intended for use in different environments. Austin used his patented invention in connection with the ordinary gear box, whereby two speeds upon the axle became sufficient, and he became independent of any attempt to get his low speed at the axle; the Minerve undertook to dispense with the ordinary gear box and provide at the axle all necessary transmissions, and thereby met new problems, perhaps practically insuperable. It is true that the gear box transmission is not an element of claim 10, and cannot be read in; but nevertheless, in deciding whether Austin invented anything over the Minerve builder, it is quite appropriate to observe that the two were working under different surroundings and upon different operative theories.

Upon the whole, we are well convinced that Austin's successful machine, as specified in claim 10, involved invention, as compared with the Minerve—probably impractical—construction.

[3] It is true that each one of these missing elements can be found in some one of the prior patents; but this is not enough to negative invention. If the selection of elements from existing machines into a complete combination has, for the first time, produced, from a practical and commercial aspect, a new result, invention may well be predicated thereon; and if producing more of a woven fabric within a stated time was a "new result" within the meaning of this familiar rule (Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177), so must be the additional mileage per gallon of gasoline, the saving of wear and the additional ease of riding, all of which the Cadillac Company so strongly attributed to the two-speed axle.

We have said that claim 10 is characterized and distinguished from the other claims by the provision that the high-speed gear pair should be on the outside; and we are referred to patents (like Smith, No. 933,864, November 7, 1911) which are said to anticipate, excepting that they have the high-speed gear inside; and it is argued that there can be no invention in the mere reversal of the position between high and low, because this is all a matter of designing and proportioning the respective number of teeth in the pinion and gear. It is shown that upon prior structures of this general class, some had the high-speed pair outside and some inside, and we cannot doubt that the transposition of these pairs would, prima facie, seem to be within the expected skill of the gear designer; but questions of invention cannot be decided on such prima facie rules. The automobile probably presents, as never before, the problem of adapting rather delicate mechanism and adjustments to the hardest kind of hard usage. Under such conditions, theoretical judgment in advance of practice is not convincing, and there is less room than in some other fields for safely assuming that a particular change in structure involves no invention. Certain it is that in an automobile structure of this type, and which carried the outer driving gear fixed upon a differential housing, and the inner "nested" therein, no one had put the higher gear pair outside. In the two or three instances which more or less respond to this de-

scription, the high had been on the inside. The very fact that there are distinct and great advantages in having the high on the outside —a fact not only apparent when it is pointed out, but confessed by defendant, which adopted this form in preference to the other—and that several successive inventors failed to notice it and adhered to the other form, tends to show that the substitution was not obvious. That there were likely to be such difficulties about the substitution as to cause mechanics to think it was impracticable in an automobile is illustrated by what defendant's experts have done. From the basis of their commercial device, they have made a drawing showing the low speed outside, to demonstrate how simple the transposition is, yet they have been compelled to reduce the diameter of their inner gear so considerably as materially to affect the mechanical problems involved, and the inner pinion cannot be inserted or removed by sliding forward along the shaft. They have also, for the same purpose, designed a transposition of high and low as applied to the Dewald French patent of 1905, but in the end, they have a high ratio of about 1 to 1, and a low of about 1⅓ to 1, a result hardly worth the trouble, because the low is higher than the highest high used outside of a racing car. True, this lack of much difference between the two ratios results from a faithful transposition of what Dewald shows, and to get the necessary practical ratios would require reorganizing his structure; but this confirms the impression that it never proved worth building. Questions of size, weight, accessibility, lubrication, suitability for very high-speed revolution, etc., complicate what, in other situations, might be simple. After a considerable period of discussion with Austin, and experimenting with his device, defendant's engineers seemed to be impressed with this feature—high speed outside—as its chief merit. Other more or less similar devices with low speed outside were open to defendant; one such patent it owned, and yet it adopted and persisted in using Austin's precise form of combination, so far as concerns this feature. Under such circumstances, it cannot safely be said that the transposition of the gear ratios, with all the changes which were involved and which followed, was a thing which, in its combined conception and execution, involved nothing but skill. We think this conclusion more consonant than the other would be with the view of invention taken by the Supreme Court in (e. g.) Expanded Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034, and Diamond Co. v. Consolidated Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527, and by this court in (e. g.) Schiebel Co. v. Clark, 217 Fed. 760, 133 C. C. A. 490, and Davis v. New Departure Co., 217 Fed. 775, 133 C. C. A. 505. Mast v. Stover, 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856, is not inconsistent; the change in gearing there considered involved none of the complications we have recited.

[4] There is no doubt that Austin at first regarded his relative arrangement of gear members and clutches as characteristic of his invention, both according to the specification and to the claims which were allowed on his original application. The idea of one fixed member and one clutch member upon the shaft and one of each upon the axle was inherent in all these. The defendant's device does not in-

fringe those claims. While the first specification notices the disposition of the gears with the high outside, this was urged as desirable because of an advantage which was due to his form of clutch and not due to his relative gear ratios; but after all this had taken place, Austin took further counsel, abandoned his application, and filed another one in renewal; and upon his new application he obtained the issue of claim 10. We see in this situation no estoppel against giving to claim 10 the full breadth implied by a natural construction of its words. Estoppel comes from accepting a narrower claim which the Patent Office makes the condition of the grant. Here, the narrow claims, which would not have reached the defendant's structure, were not accepted as the full measure of the grant, but were refused, and the applicant deliberately insisted upon and secured the claims which he thought appropriate.

Very likely the necessity for these new claims was brought to Austin's attention by his dealings with defendant, and by observing defendant's later structure. Speaking now of the additional character given to the combination by having the high outside, if this feature had not been embodied in Austin's structure, but had later been added by defendant, and Austin had then secured a generic claim reaching to the form which he had not made, we might well apply what Judge Wallace said in Westinghouse Co. v. New York Co. (C. C.) 87 Fed. 882, 884, and hold that he was endeavoring to gather unto himself an invention which the defendant had made; but that is not the case here. This feature of Austin's device was completely present in the structure which he brought to defendant. His original failure to claim it when not used in combination with his peculiar clutch ought not, on any principle, to prevent him from claiming it as soon as the propriety of doing so occurred to him. Although during the negotiations Austin furnished defendant with copies of his claims as they stood, we cannot see that defendant was misled. The fact that this feature—high outside—was regarded by Austin as his chief advance, and that he so presented it to defendant clearly appears, as does the further fact that Austin then notified defendant that he had employed other advisers, and that he expected to be able to get better claims. A defendant who proceeds to manufacture under such circumstances has nothing to complain of if the applicant succeeds in getting better claims and if the courts sustain them.

We do not imply that defendant is to be condemned as having acted unfairly. Although the Austin device convinced defendant that the two-speed axle was or could be made practical, it had a perfect right to manufacture such an axle, if it did not infringe upon the patents of Austin or any one else. It kept away from Austin's claims, as they had so far been formulated. In view of the state of the art, as defendant then examined it, its officers may well have been advised and have believed that Austin could not procure any patent which would cover their form. The question of patentability is too close to justify assuming that there would be any bad faith in such belief. Each party endeavored to get the rights and advantages which the patent laws secured to him as an inventor or a manufacturer; and the ques-

tions of patentability and infringement we have intended to decide upon their merits, and without assuming that either party acted unfairly toward the other.

The decree below is affirmed, except as to claims 13 and 14, withdrawn after appeal. The relative character of these claims and claims 9–12 and the history of the withdrawal do not justify awarding, on this account, costs of the appeal against Austin; neither party will recover costs in this court. A new decree should be entered upon claims 9–12 only.