## WINTON MOTOR CARRIAGE CO. v. LINDSAY AUTO PARTS CO.

(Circuit Court of Appeals, Sixth Circuit.   December 12, 1917.)

No. 2893.

1. PATENTS ☞328—INVENTION—AUTOMOBILE AXLE.

The Lindsay patent, No. 748,760, for a rear axle for automobiles, claims 2 and 3, in view of the prior art, *held* void for lack of patentable invention.

2. PATENTS ☞174—INVENTION—CLAIM.

In determining whether the patentee made a material advance, the invention to be considered is that defined by the claim in suit.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 249.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. PATENTS ☞49—CLAIMS—STRUCTURAL DETAILS.
     When the device commercially accepted included features covered by claims not in suit and by other patents, and the claims in suit rest upon minor structural details, there is little reason to attribute the commercial success to these claims.
     [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 59–62.]

4. PATENTS ☞26(1)—INVENTION—IMPORTANCE.
     In determining whether changes involve invention, it is of some importance that they relate to assembly rather than to operation.
     [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Suit in equity by the Lindsay Auto Parts Company against the Winton Motor Carriage Company. Decree for complainant, and defendant appeals. Reversed.

F. P. Fish, of Boston, Mass., for appellant.
Charles Martindale, of Indianapolis, Ind., for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and COCHRAN, District Judge.

DENISON, Circuit Judge. Suit for infringement, brought by the Lindsay Company against the Winton Company, on claims 2 and 3 of Lindsay patent, No. 748,760, dated January 5, 1904, on application filed August 18, 1902, covering a rear axle for automobiles. The District Court held both claims valid and infringed, and the defendant brings this appeal.

[1] The rear axle of an automobile is a shaft which is driven by power, suitably transmitted from the engine, and which, in turn, revolves the rear wheels rigidly attached thereto. Before Lindsay's time the rear axle had been evolved into a two-part structure comprising the revolving shaft itself and a surrounding (fixed) tubular casing, which directly supported the car body above and contained the "live" axle within it. It was also common practice, from almost the beginning of the art, to cut this driving axle across, making two half axles, one of which drove the right-hand and the other the left-hand wheel, and to connect these two parts centrally by some differential means so that both halves would normally be driven at the same speed, but one part might revolve faster than the other. This differential unit consisted of gearing of diameter larger than the axle shaft, so that the surrounding tubular casing must either be cut away from that part of the shaft or else must be enlarged so as to surround the differential. Repairs to this central gearing were often necessary, and, under the original practice, the body of the car was otherwise supported while the rear axle carrying both wheels was removed and taken apart. Lindsay made his tubular casing of shape to swell out around and cover the differential, and he also divided it vertically into three sections, the central and larger portion constituting one section and each tubular end portion another. The central part was again subdivided horizontally into upper and lower halves, and, along all meeting edges,

facing flanges were provided with registering bolt holes, whereby the parts could be bolted together.

It had also been common that the inner end of each shaft section should be more or less permanently attached to the adjacent bevel gear of the differential unit. Wishing this attachment to be separable, Lindsay employed a spline—in the form of a key in an open-ended slot—so that the shaft end might be drawn out lengthwise from the gear, and yet, before withdrawal, shaft and gear must rotate together. To stop or to permit this axial motion of each shaft section, he rigidly fixed upon each a collar just outside the end of the tubular casing and surrounded this with a cap which screwed down over the collar and on the outside of the casing end. When this cap was removed, the shaft section was free to come out. By this construction, when his tubular end sections and his divided central casing were bolted together, the completed casing was strong and self-supporting, one-half of the central part—the upper or lower—could be removed like a cover for access to the central gearing and the remaining half would still support and hold in line the tubular end sections. By moving each shaft section outwardly just enough to disengage it from its bevel gear, the differential could be removed through the cover opening.

In the same way repairs in either shaft section were facilitated.

With this preliminary description and by reference to Fig. 2 of the patent here reproduced, we can understand Lindsay's claim 2, which reads as follows:

"In a motor-driven vehicle, the combination, with a pair of tubular axle structures, of a pair of casing-sections connecting the adjacent ends of said tubular axle structures, and one of said casing-sections being detachably connected, a pair of shaft-sections revolubly mounted in the axle structures and projecting into the casing-sections, and axially separable driving connection between the shaft-sections from which the shaft-sections may be outward axially withdrawn, and independent means for normally retaining the shaft-sections against axial displacement, said means being removable to permit the outward withdrawal of each shaft-section from the structure."

The history of this claim in the Patent Office demonstrates that both the patentee and the Patent Office thought it was new in this arrangement of parts to permit either shaft-section to be disconnected from its gear and withdrawn axially by operating a simple engaging device

and to permit the central part of the casing surrounding the differential to be opened so that the differential could be easily inspected, and, if necessary, could be withdrawn through the opening by merely disengaging the shaft ends. In this both were mistaken. Substantially the same longitudinal division of the casing into three sections, and subdivision of the central part into upper and lower halves, and for the purpose of allowing one-half of the central section to be removed to permit easy access to the differential, were disclosed in at least two earlier patents, one of them to Lindsay; and an earlier patent to Winton, taken in connection with the structure built in supposed conformity to the Winton patent and the public use of which, antedating Lindsay, is abundantly proved, discloses, approximately, the combination of the claim. The differences between this Winton structure and the Lindsay patent are those now to be discussed, and whether such differences show patentable improvement is the controlling question.

As to general features and general function of parts, the earlier Winton and the later Lindsay are the same; the differences are two. The first is that the splined engagement between shaft-section and its bevel gear is, in Lindsay, made detachable by the above-described collar and cap at the wheel end; and, in Winton, by a set screw passing through the hub of the gear and bearing upon or extending into the shaft. To break the engagement, Winton opened the cover in the central casing and unscrewed the set screw, while Lindsay unscrewed the cap at the outer end. In view of the fact that before either Winton or Lindsay, Cate and others had provided detachable engagement between the tubular casing and the half section of the axle therein in precisely the form shown by Lindsay, it is doubtful whether invention could be predicated on his substitution of his collar and cap for Winton's set screw; but the form of this claim makes that inquiry immaterial. Several of the other claims not in suit distinctly call for this collar and cap connection, while claim 2 specifies "independent means for normally retaining the shaft-sections against axial displacement; said means being removable to permit the outward withdrawal of each shaft-section from the structure." It is true that no other claim is identical with claim 2 in every particular, except this, and so there is no hard and fast rule making it impossible to limit claim 2 by considering it as contemplating only the collar and cap, as its "means"; but a comparison of claims shows clearly that the four-member axle casing—the "pair of tubular axle structures" and the "pair of casing sections"—furnished the characterizing identity of this claim, and that it was deliberately drawn as it is for the express purpose of escaping the very limitation which it is now said should be imported in order to support validity. Hence it must be said that the set screws of Winton are "means for normally retaining the shaft-sections, etc."; and since Winton could not, in this particular, escape the charge of infringing Lindsay, if Lindsay had been earlier, the claim must have the same scope when we look in the other direction, and is—so far—anticipated, unless because of some distinguishing force in the word "independent." Defendant says that "independent" means "independent of each other," referring to the function whereby either shaft-

section can be withdrawn without disturbing the other—and Winton did this. Plaintiff says that the word has reference to the differential, and refers to a retaining device outside of and away from the differential unit—and Winton had none. In this conflict of construction we cannot agree with plaintiff. Whether the removable means that holds the shaft against axial motion is carried by the differential or by the casing, and in what particular way, cannot be functionally important, and that either merit or difference should lie in that distinction would not be the natural thought of the inventor. On the other hand, the thought that each half section was removable separately is repeatedly brought out in his specification and claims and affords a natural meaning for this limitation. True, there was nothing in itself new in making each axle-section separately detachable, and it follows that "independent," if used in this sense, did not carry novelty; but it is equally true that it was old to make detachable engagement between axle-section and casing independently of any retaining means in the central gearing (Elliott, De Dion), and that sense of the word is equally futile to indicate an added novel feature. To give this word the meaning now proposed by plaintiff would limit the claim in a way and to an extent foreign to the patentee's thought.

- The second point of difference between Winton and Lindsay is in the form of the central casing. Winton's two end sections of his tubular casing were originally and permanently connected by a yoke rectangular in form. To each side of this yoke there was attached the half of an inclosing case made of wood and thin metal stamped into shape, but having no structural strength. These parts of Winton's structure served the purpose of inclosing the differential to protect it from dirt and to protect adjoining parts from oil, and served, also, the purpose of permitting easy access to the differential for inspection or removal, but they did not rigidly support the two end sections; that was done by the yoke. If it had been new with Lindsay to make a self-supporting and weight-carrying axle casing by uniting his four rigid and strong parts bolted together, we might concede invention in this change from Winton to Lindsay; but that was not new. The same thing had been done by Lindsay himself, by Perret, and by others years before; and to apply this to Winton's structure seems to us clearly within the skill properly to be attributed to the worker in this art. If there were a new result achieved, we might see more than mere skill, but the only new result claimed is that the shaft-sections could be pulled out and the differential thereby became removable from the casing—and Winton had done this.

Even if we regard Winton's side covers as materially variant from the central inclosing case of Lindsay, the situation then takes this shape: The complete structure embodies two units. The live axle and its central gearing form one unit. The casing, comprising the tubular end portions and the central enlarged portion, is the other unit. This casing unit surrounds, protects, and carries (or is carried by) the live axle unit. There were in existence several examples of a live axle unit having the shaft-sections detachably connected with their

bevel gears. These were surrounded by whatever kind of casing the builder thought proper. All the casings had the end portions in tubular form. For the central enlarged portion, Winton used an open yoke leaving the gear exposed, excepting for his rather imperfect covers (which we are now leaving out of consideration); Elliott used a form in which the central portion was divided vertically and the two parts could be separated horizontally "to facilitate the manufacture of the machine and permit of the introduction or subsequent examination of the internal parts"; De Dion does not describe his central inclosure; Frantz made it of globular form, apparently integral with the tubular end portions, but having an opening and cover on top of the globe. Every casing which inclosed the gearing provided some separability at this point; otherwise the device could never be assembled. Among the variety of such forms Perret had shown substantially the form used in the Lindsay patent in suit, and Lindsay himself, by his 1898 patent, had shown exactly this built-up, four-member casing. It results that what Lindsay did, by the patent in suit, was to take a common form of live axle and surround it with one instead of another common form of casing. This could not be invention, excepting as some peculiarity of the selected form of axle unit united with some peculiarity of the selected form of casing to bring a new result; and we have seen that this did not occur. This conclusion is confirmed by the fact that many of the types of axles now in common use which do not employ this built-up construction, and so do not infringe, yet give the same result. One of them is the Winton casing of 1898 without material change, excepting that the caps are made of heavier metal and attached more closely.

[2] We do not get the right view of this question, unless we observe that the invention, defined by the two claims in suit, pertains essentially to this sectional construction of the casing. Lindsay thought his invention consisted in uniting any live axle unit, where the shaft-sections were detachable from their bevel gears, with any surrounding casing where the central part could be opened to take out the differential, and several of the claims granted show that the Patent Office had the same view. Not only does the present record show that such a broad claim was unfounded, but plaintiff (for the purposes of this suit) practically concedes the validity of these other claims to be doubtful by not bringing suit upon them, although they are plainly infringed. When this situation is taken into account, there is so much the less room for thinking that the invention now in suit should be regarded as a material advance, entitling Lindsay to substantial credit.

[3] The same consideration affects the force to be given to commercial use. As so often happens, plaintiff says there is a strong inference of that utility which is a "new result," because the device has gone into extensive use, and defendant says we should infer that there was no novel utility, because the device has not been commercially accepted. The fact is, a few axles in the form shown by this patent, and embodying, also, other Lindsay patents, were sold by the Lindsay Company; and then that company went out of business. Later, the Tim-

ken Company took a license under this and two other Lindsay patents, and under them, and in connection with designs and improvements of its own, made an axle which was widely sold and was bought and used by defendant for one year; but there is slight room to infer that its commercial acceptance was due to the merits of this particular patent rather than of the other patents and improvements which it embodied, and still less to attribute its commercial success to the comparatively minor structural detail, viz. the peculiar sectional casing, without which it would not have responded at all to the two claims in suit. The commercial success of this Timken axle throws no light on the validity of this claim.

We do not hold that Lindsay's association of elements is an aggregation, in the sense in which that word is distinguished from combination; but rather that what Lindsay did displayed only the judgment to be expected from one skilled in the art. Nor do we overlook the argument that the combination is new although the elements are old. If Lindsay had taken an existing combination of axle parts, and, for the first time, had joined with them two elements, the removable cover for the differential case and the removable means for holding the shaft-section in longitudinal position, both of these elements being old, we would have a case of more difficulty; but what he did was to take an existing complete combination, and, for one element of it, substitute a known equivalent.

[4] In determining whether Lindsay's changes involved invention, it is of some importance that this is an assembly patent rather than one for interoperating mechanism. This may be illustrated by comparing with Cadillac v. Austin, 225 Fed. 983, 141 C. C. A. 105. There the related parts, in their novel features, co-operated with each other while running, and there were involved problems of effective and economical power transmission—problems of the class which every one knows are sometimes modified by unforeseen conditions, so that a seemingly simple question may turn out to be difficult and complicated. We took this view of the substitution there made between internal and external gears, and were unwilling to say that the change was an obvious expedient. On the other hand, this Lindsay patent belongs to the class of assembly patents, one of which we recently considered in Ft. Pitt Co. v. Ireland Co., 232 Fed. 871, 147 C. C. A. 65. When the Lindsay axle is in operation and the car is running, the only features claimed to be novel are of no importance; no one wants to take out the differential or remove the axles. Lindsay's whole object was to provide for simple and easy taking apart and putting together of the structure so that it would be ready to run or ready to be repaired as desired. We do not by any means say that there can be no invention in the device because its only novel utility is for convenient assembling and disassembling; but the lack of other utility, coupled with the known ability of good mechanics to bring about this result in a great variety of ways, must make it more difficult to convince that anything more than skill was involved. If any one negative definition of "new result" is settled, it is that such result is not found

in the change from integral to sectional, or vice versa, merely to facilitate manufacture or assembly; and upon only that change the patentability of claim 2, when differentiated from the broader view now abandoned, at last rests.

We are content to rest our conclusions upon the reasons stated, without reference to the French Chaboche patent of 1899. This is confessedly a perfect anticipation (as to all features, except the casing form), unless it loses that character because of a mistake or obscurity in the drawing. If it were vital, we should hesitate to reject it for that reason.

Of course, it is not important, as against the Winton patent and public use of 1898, Lindsay's 1898 patent, the Chaboche patent, etc., that Lindsay can antedate them with his conception or even reduction to practice. The statute has fixed an absolute limit of two years, and an inventor, who delays his application more than two years after the statutory published description or public use, forfeits his contingent right to a monopoly.

Claim 3 differs materially from claim 2 only in that it adds, as an element, a tongue and groove connection between the flanged or headed inner ends of the tubular casing sections and the adjacent faces of the central members (22, 23 in Fig. 2). Where two parts are to be joined endwise, and the joint must resist lateral strain, it is the commonest expedient to use tongue and groove, lug and recess, dowel pin and socket or telescoping joint, and such use cannot make patentable an otherwise unpatentable combination. If this claim contemplates specifically (and we think it does) an annular tongue (23) on the outer surface of the tube head, and a corresponding groove on the interior surface of a flange or collar (22) projected from the central member so as to surround the tube head, the plane of both being at right angles to the axial line, defendant does not infringe.

The decree below is reversed, and the case remanded, with instructions to dismiss the bill.