WEBSTER ELECTRIC CO. v. PODLESAK et al.

(District Court, N. D. Illinois, E. D.    February 13, 1919.)

No. 553.

1. PATENTS ☜191—NATURE OF GRANT.
    A patent conveys to the patentee only the negative right of exclusion, not the natural original right to make, use, and sell the device covered by it.

2. PATENTS ☜212(2)—LICENSES—RIGHTS ACQUIRED BY LICENSEE.
    A licensee under a patent obtains only immunity from an injunction suit against him by the patentee or owner.

3. PATENTS ☜202(1)—LICENSE—CONSTRUCTION.
    Under a shop license granted by patentees to complainant for the term of the patents, with the sole right to maintain infringement suits and, a limited right to grant licenses, reserving to patentees only the right "to themselves make, use, and sell the inventions," such reserved right was not assignable, and did not pass by an assignment of the patents.

4. PATENTS ☜112(4)—PRIORITY OF INVENTION—DECISION ON APPEAL FROM PATENT OFFICE.
    While decisions of the Court of Appeals of the District of Columbia in interference proceedings are not conclusive in the courts, they are presumptively correct on questions of fact, and not subject to collateral impeachment, except for gross mistake or fraud.

5. PATENTS ☜328—VALIDITY AND INFRINGEMENT—ELECTRICAL IGNITION DEVICE.
    The Kane patent, No. 1,280,105, for electrical ignition device for internal combustion engines, claims 3, 7, and 8, held valid and infringed.

6. PATENTS ☜125—VALIDITY—DELAY IN ISSUANCE.
    Mere delay between the application and issuance of a patent does not affect the validity of the patent.

7. PATENTS ☜328—INFRINGEMENT—ELECTRICAL IGNITION DEVICE.
    The Podlesak patents, reissue No. 13,878 (original No. 1,055,076) and No. 1,101,956, for electrical ignition devices, held infringed.

In Equity. Suit by the Webster Electric Company against Henry J. Podlesak, Tesla Emil Podlesak, the Sumter Electrical Company, and the Splitdorf Electric Company. Decree for complainant.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Williams, Bradbury & See and Jerome N. Frank, all of Chicago, Ill., and Livingston Gifford, of New York City, for plaintiff.

Charles C. Bulkley and Gann & Peaks, all of Chicago, Ill., and Sturtevant & Mason, of Washington, D. C., for defendants Sumter Electrical Co. and Splitdorf Electric Co.

Henry Joseph Podlesak, of Chicago, Ill., pro se.

William D. Thompson, of Racine, Wis., and William L. Hall, of Chicago, Ill., for defendant Tesla Emil Podlesak.

SANBORN, District Judge. Original and supplemental bills for patent in infringement and unfair competition. Suit was commenced October 12, 1915, and the supplemental one October 25, 1918. The patents involved are as follows:

No. 13,878 (reissue), to Emil Podlesak, February 9, 1915.
No. 1,055,076 (original), to Emil Podlesak, March 4, 1913.
No. 947,647, to Henry J. and Emil Podlesak, January 25, 1910.
No. 948,483, to the same persons, February 8, 1910.
No. 1,003,649, to the same persons, September 19, 1911.
No. 1,022,642, to Henry J. Podlesak, April 9, 1912.
No. 1,056,360, to Henry J. and Tesla E. Podlesak, March 18, 1913.
No. 1,098,052, to Emil Podlesak, May 26, 1914.
No. 1,098,754, to Emil Podlesak, June 2, 1914.
No. 1,101,956, to Emil Podlesak, June 30, 1914.

The supplemental bill is for infringement of the patent to Edmund J. Kane, No. 1,280,105, September 24, 1918, application Feb. 2, 1910. These patents all relate to current generators for ignition applied to internal combustion hit and miss engines, and improvements.

The validity of the Podlesak patents was not a matter of controversy on the trial, by reason of the fact that the plaintiff and the corporate defendants are licensees or assignees of the Podlesak patents, and hence are estopped to question their validity. Thus the controversy involved the construction of the two license contracts, Exhibits C and D, explained later, as well as the validity of the Kane patent, brought in by supplemental bill. The contracts referred to, with two others, are in substance as follows:

By Exhibit A, license agreement of November 2, 1908, the Podlesaks give to plaintiff's predecessor the exclusive license to make, use, and sell within the United States, for the term of any patents which might be granted, applications No. 76,559, 413,068, 413,069, and 413,070, and convenanting that, while the license was in force, they would not grant, permit, or encourage others to make, use, or sell the inventions. It was agreed that the agreement should extend to and be binding upon the heirs, assigns, and legal representatives of the Podlesaks and the successors and assigns of the corporation. It is claimed by defendants that this agreement was revoked some time before February 5, 1914, when Exhibits C and D were made.

Exhibit B, August 17, 1912, is a contract between the Podlesaks, dividing their interests among themselves in the patents in question, and serial No. 618,483.

By license agreement, Exhibit C, February 5, 1914, the Podlesaks granted to plaintiff the exclusive right to make, use, and sell the inven-

tions described as Nos. 947,647, 948,483, and 1,003,649 within the United States for the patent terms, covenanting that they would not, while the license was in force, make, use, or sell the inventions, or permit, grant, or encourage others to do so. The same provision as to assignment was also contained in this license.

By the shop-right agreement, Exhibit D, February 5, 1914, the Podlesaks made a contract with plaintiff, reciting that they were owners of patents Nos. 1,022,642, 1,055,076, and 1,056,360, and applications Nos. 734,143, 668,153, and 639,738 and that plaintiff desired to secure a shop right and license to make, use, and sell the inventions in the United States for the life of the patents, and that it was therefore agreed that the Podlesaks granted to plaintiff a shop right and license to make, use, and sell the inventions described in the patents and applications in the United States for the terms of the patents.

The corporation further agreed that it would use the devices made under this shop license only in connection with or for repairs to the devices mentioned in Exhibit C, and if made or sold not as a part of such devices the corporation would pay royalty, 5 per cent. of gross receipts. The licensors agree "that they will not, while this license to the party of the second part is in force, give or grant shop licenses to make, use, or sell the herein said inventions, expressly reserving, however, the right to themselves to make, use, and sell the herein said inventions"; this agreement to be terminated upon the termination of Exhibit C.

The same clause as to assigns is contained in this paper as in Exhibit A. By clause 8 of Exhibit D it is provided that the plaintiff with the written approval of the Podlesaks, may grant shop licenses, to makers of or dealers in gas engines or gas engine accessories, embodying the inventions of patents 1,022,642 and 1,055,076 (the latter being for a bracket to mount the magneto upon the engine), on the same terms as to use only in connection with the inventions licensed in Exhibit C.

By the ninth paragraph it was provided that the plaintiff "shall not permit or encourage other parties to manufacture, use, or sell devices covered by hereinbefore mentioned patents or patents that may be granted on herein said applications," except as above provided as to licenses to engine builders or dealers.

In the second paragraph it is agreed that both parties should assist each other in procuring patents, and in any suit or proceeding brought under any of the patents or for their infringement; but the Podlesaks should not be required to bear any expense in any such suit, and they appointed the attorney for the plaintiff as their agent or attorney for the purpose of joining them as complainants in any such suit for infringement, without expense to the Podlesaks, who were to be exempt from liability for damages and costs in such suits, which were to be assumed by the plaintiff.

A further agreement, made January 20, 1915, Exhibit E, changes the royalty and contains the same agreement as to assigns. The Podlesaks having on September 4, 1915, assigned all these patents to the Sumter and Splitdorf Companies, and the contracts, Exhibits C and D, the construction of the license agreements becomes very important.

It should further appear that Emil Podlesak entered the employment of plaintiff's predecessor August 10, 1909, for the purpose of experimenting in magnetos, and if patents should be obtained on his inventions relating to the magneto then in use they were to be assigned to plaintiff's predecessor. In May 18, 1910, a second contract was made, providing that Podlesak should give his entire time to the development of magnetos for the use of which a royalty was to be paid; and by a third agreement, made March 3, 1913, reciting that Podlesak was employed by plaintiff, and that it desired to secure for its benefit and use such improvements in ignition apparatus as he might from time to time develop and that any patents obtained by him thereon should be assigned to plaintiff. This contract was to run until March 3, 1916. Podlesak ceased to be employed under this contract May 14, 1915. Under these contracts Emil Podlesak was successively an employé, superintendent, works manager, and secretary of plaintiff corporation. These employment contracts, so far as they relate to the ownership of patents, were superseded by Exhibits C and D above stated.

The meaning or construction of Exhibit C is entirely clear. The Podlesaks reserved no interest of any kind in any of the patents licensed and had nothing to assign to the Splitdorf Company, except the right to the royalties secured by the contract and the legal title to the patents. That is all the assignee took by the assignment. There is no controversy on this point. The second contract, Exhibit D, however, is not so plain.

[1-3] A patent conveys to the patentee only a negative right of exclusion, not the natural original right to make, use, and sell the device covered by it. A licensee by the license obtains only immunity from an injunction suit brought against him by the patentee or owner. Paper Bag Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122; Hartman v. John D. Park & Sons (C. C.) 145 Fed. 358; C. & A. Ry. Co. v. Pressed Steel Car Co., 243 Fed. 883, 156 C. C. A. 395 (Seventh Circuit). So by the first clause of the contract the plaintiff obtained immunity from suits by the Podlesaks against it, but left them free to grant licenses to others, except so far as the plaintiff was authorized to grant licenses to engine builders and dealers in engines or accessories, such as the Splitdorf Company. The right of exclusion of others, which is the right, dominion, or monopoly secured by the patents, was thus parceled out, divided or partitioned as follows: The Webster Company had the right to exclude every one but their engine builder or accessories dealer licensees and the Podlesaks. By the second paragraph the plaintiff might sue for infringement and control of the litigation, and by paragraph 8 grant licenses to a limited class, reserving royalties to itself. Excluding for the moment the later provisions of paragraph 1, quoted above, the patentees might grant licenses, except to the limited class referred to. But by paragraph 1 they covenanted that they would not exercise this right; "that they would not give or grant shop licenses to make, use, or sell the herein said inventions, expressly reserving, however, the right to themselves to make, use, and sell the herein said inventions." Then by the final clause the contract was made to extend to and be binding upon assigns, etc.

The vital question, therefore, is: Did the patentees have the right to assign the reserved right or power to make, use, and sell, in view of all the recited provisions? It will be noticed that they retained no power of exclusion whatever; that was in the plaintiff. Their patent rights were gone, but the Webster Company yielded to them the right to go into business. They did not avail themselves of this; but, if they had done so, and a competitor had infringed, it seems clear that they could not have maintained an infringement suit, since that right was in the Webster Company alone. But not to place too much weight on a technical point, Is the provision for assignment at all consistent with their agreement not to make shop licenses, or with the clause giving the right to the plaintiff to license to makers of and dealers in engine accessories? The patentees have assigned the patents to the defendant companies, members to which plaintiff was authorized to grant licenses, and those companies are now exercising shop rights under the assignment, apparently in the face of the agreement that the patentees would not authorize this, and that the plaintiff might do so.

The only way to harmonize all the contract provisions is to regard the right of the patentees to assign as limited to the bare legal patent title and the right to royalties, accounting, and inspection, and that the words "to themselves" should read "to themselves only." Thus all the provisions are made consistent inter se, and an inequitable result prevented. The patentees have received $95,416 in royalties under Exhibit C, covering six years, or $16,000 a year. They could well afford to stay out of the risks of business. To attempt to authorize a formidable competitor like the Splitdorf Company, one of the very dealers to whom plaintiff was given the right of license, after the plaintiff had built up an enormous business, to profit by that business, is utterly foreign to the spirit and purpose of the contract. The assignment should be restricted to the legal title and right to royalties, accounts, and inspection, and the power of the plaintiff to sue for infringement without joining the assignees be recognized. Whether the right of inspection of plaintiff's books should be regulated, so as to prevent a competitor from learning the customers and business secrets of the plaintiff, should be postponed until the decree is settled.

The case of Waldo v. American Soda Fountain Co. (C. C.) 92 Fed. 623, is distinguishable, because the general clause making the contract extend to assigns could not possibly reach any assignable interest, except that to which the court applied it.

*The Kane and Milton Patents.* Both these patents were produced in plaintiff's shop by its employés and with its facilities. It owns the patents, and by its outlay and business management has made them of great value. It could have sued on both of them in the alternative, and thus escaped the burden of establishing the priority of either. Having sued on Kane, it must technically show its priority; but it has always owned both, and has given them almost all of their value.

It is indeed true that Kane must be shown to have been the prior inventor, by proof beyond reasonable doubt. This is required by the law, and the evidence must be clear and convincing. Milton's British appli-

cation was filed first, and Kane's at a later date, but within a year. Hence the rule as to reasonable doubt applies in full force.

The evidence shows the following: Both Milton and Kane were plaintiff's employés. Milton was Kane's superior, being employed as an engineer and inventor, whose inventions were to belong to plaintiff. During the year 1909, up to August 20, he was working on a high-tension magneto for variable speed, multi-cylinder gas engines, which gave great promise, and was the means of securing a large contract for plaintiff with the Cadillac Company, but which was a failure. He was also paying some attention to the low-tension magneto for hit and miss engines.

In April, 1909, the magneto produced by plaintiff, called the Milton magneto, proved unsatisfactory, and there was danger of plaintiff losing the business of supplying it to its chief user, the International Harvester Company. Mr. Webster, the president of the plaintiff, urged Kane and another employé, by the name of Chiville, to try to produce a device which would solve the difficulty. Kane worked the matter out on April 11, 1909, made an incomplete drawing, and brought it to plaintiff's office. He followed this by a complete drawing, made April 14, 1909, showing the new device in full detail. He exhibited the first drawing to his father, then employed by the Harvester Company, and to persons in the office, and the later drawing to Mr. Chiville and others, and a device made according to the later drawing was produced shortly after, put on an engine, and worked satisfactorily. None of these facts is in dispute, but Milton testifies that the idea was his, and not Kane's and that the latter made the last drawing under his direction. Kane produced both of the drawings, they bear his name and the dates, and he is corroborated by his father, who produced his diary, showing the date appearing on the first drawing, both of which are in evidence.

Milton's testimony that the drawings were made under his direction is not corroborated, except by slight circumstances unsatisfactory in their character, and is inconsistent with his testimony and conduct in the Kane-Milton interference proceedings in the Patent Office. In those proceedings he put the date of his disclosure in August, 1908. On this trial he adopted Kane's date. He took very little interest in the interference proceedings, but refused to concede priority to Kane. His American patent was owned by plaintiff, so he had no interest in showing priority, except the pride of an inventor. He produced no drawings showing his alleged discovery, other than those in the English patent, made in October, 1909, no original drawings whatsoever, no corroboration of his claim to invention. While the correspondence in 1909 between him and Mr. Webster shows that he took considerable interest in the improved low-tension magneto, as well as the high-tension device, and he attempted to develop it in England, yet the evidence as a whole is overwhelming that he was not the inventor, and that Kane was. The evidence is thoroughly satisfactory.

[4] A like decision was reached in the Patent Office also, and this determination imposed upon Milton the burden of showing its incor-

rectness under section 4914, R. S. U. S. (Comp. St. § 9459). Decisions by the Court of Appeals of the District of Columbia in interference cases are binding on the office; they are not res adjudicata in the courts. Westinghouse v. Hein, 159 Fed. 936, 87 C. C. A. 142, 24 L. R. A. (N. S.) 948. Like all executive decisions they are presumptively valid on questions of fact, not subject to collateral impeachment, except for gross mistake or fraud. A patent is presumed valid, as everybody knows. Like presumption should aid the decision of the examiner in deciding an interference.

Apart from these considerations, however, the proof shows that Kane is beyond reasonable doubt the first inventor.

[5] *The Kane Patent.* It is urged by defendant that the claims of the Kane patent sued on, being 2, 3, 7, and 8, are invalid, because not within the original disclosure; 2 and 3 being in the Milton interference, and the others first introduced in 1918. Thus it is necessary to examine Kane's original application, on which he obtained his first patent, No. 1,204,573; the one in suit having been issued on a divisional application.

Kane's first application of February 2, 1910, describes the magneto, and the mechanism by which the armature is so operated as to cause a spark to be produced in the engine cylinder at the instant of compression. The drawings show the device fully, with one exception, and are reproduced in the patent in suit, with an additional one taken over from the Milton patent, showing how the movable electrode is brought back to normal position. It is true that the main object of Kane seems to have been to cover means for rendering the apparatus inoperative during the high-speed period of the engine. But if he shows enough in his specification, drawings, and claims to cover the elements of the claims made later, in the patent in suit, that is sufficient.

In the first place, the drawings in the first application exhibit all that the later claim 2 includes, except the curved cam surface. They show a cam surface, in the sense that two surfaces are brought in contact by circular movements around different centers and with different radii. They slide on each other, and there will be the true cam movement. Claim 3 of the patent in suit counts on a cam surface only, and hence that claim is certainly within the original drawings. Kane therefore had the right to make that claim.

Claims 7 and 8 are much broader, and it is urged that the original disclosure did not cover the subject-matter of these two claims. The claims follow:

"7. In an electrical ignition device for internal combustion engines, the combination of a magneto generator comprising rotor and stator and generating winding, a pair of relatively movable make and break spark electrodes adapted to be located within an engine cylinder, spring means tending normally to hold said rotor in a certain position, mechanism whereby the movement of the rotor effects the separation of said electrodes at a predetermined point in the movement of the rotor, a rigid unitary and integral support upon which all of the aforesaid parts are mounted, whereby all of said parts may be removed from and returned to their position upon an engine cylinder without disturbing their relations one to another, conductors for carrying electric current from said generating winding to said electrodes,

and engine driven means adapted to oscillate said rotor against the action of said spring means and then to release it.

"8. In an electrical ignition device for internal combustion engines, the combination of a magneto generator, comprising rotor and stator and generating winding, a pair of relatively movable make and break spark electrodes adapted to be located within an engine cylinder, spring means tending normally to hold said rotor in a certain position, mechanism whereby the movement of the rotor effects the separation of said electrodes at a predetermined point in the movement of the rotor, a supporting member upon the several parts of which all of the aforesaid mechanism is mounted and having a single integral part adapted to be attached to the engine, whereby all of said mechanism may be removed from the engine by removing said single integral part and may be returned to its position upon the engine with unchanged relations between any and all of the parts of all of said mechanism, thereby insuring the predetermined synchronism and interrelated adjustment of said mechanism when it is replaced upon the engine, and engine driven means adapted to oscillate said rotor against the action of said spring means and then to release it."

Original claim 8 in the first Kane application reads:

"8. In igniters for explosive engines, the combination with an electric circuit having included therein two electrodes, of means for normally holding the electrodes in contact with each other, a magnetic field, an oscillatory armature located in said field and included in said circuit, a reciprocating member controlled by the running of the engine for moving the oscillatory armature in one direction, means for moving the oscillatory armature in the opposite direction, means for separating the electrodes when the oscillatory armature is moved in said opposite direction, and means for timing the movement of said armature in said opposite direction."

I think that claims 7 and 8 are shown in all their elements in the original application. Figure 1 shows the unitary structure attached to the engine, and claim 8 (original) shows in a general way the electrical device. I find claims 3, 7, and 8 of the Kane patent in suit valid.

[6] Eight years elapsed between applying for and issuing the Kane patent, but Kane complied with the law and Patent Office rules in all respects. Two interferences had to be disposed of, with the necessary delays incident to them. A divisional application was required and must be prosecuted. Mere delay does not affect the validity of the patent. Columbia Motor Car Co. v. Duerr & Co., 184 Fed. 893, 107 C. C. A. 215; Cleveland Foundry Co. v. Detroit Vapor Stove Co., 131 Fed. 853, 68 C. C. A. 233; Cadillac Motor Car Co. v. Austin, 225 Fed. 983, 141 C. C. A. 105. There are many other like decisions.

The question of collusion in the Milton-Kane interference is entirely set at rest in favor of plaintiff by the decision in this circuit of Western Glass Co. v. Schmertz Wire Glass Co., 185 Fed. 788, 109 C. C. A. 1.

It is unnecessary to consider the effect of dissolving the Kane-Podlesak interference by reason of the conclusion that the assignment of Exhibit D is limited to the patent legal title, royalties, accounting, and inspection.

[7] Claims 1, 2, 3, 8, 9, 21, and 22 of the Podlesak reissue, No. 13,878, are infringed; also such claims of Podlesak patent, No. 1,101,956, as may be in issue.

No sufficient proof of contributory infringement appears, and the bill should be dismissed as to the Podlesaks. Other matters reserved until settlement of decree.