## MINER v. T. H. SYMINGTON CO.

### (District Court, W. D. New York. October 24, 1916.)

### No. 127.

1. PATENTS ⬧328—VALIDITY AND INFRINGEMENT—DRAFT RIGGING.

The Miner patent, No. 668,655, for a draft rigging for railroad cars, while in an old art, is for a combination not anticipated, and covers a patentable improvement; claims 4 and 5 *held* infringed.

2. PATENTS ⬧165—CONSTRUCTION—LIMITATION OF CLAIMS.

A limitation expressed in one claim of a patent cannot be read into another claim from which it is omitted.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. ⬧165.]

3. PATENTS ⬧328—VALIDITY AND INFRINGEMENT—DRAFT RIGGING.

The Miner patent, No. 668,656, for a draft rigging for railroad cars, claim 8, *held* not anticipated, valid, and infringed; claim 2 *held* void for lack of novelty.

4. PATENTS ⬧157(2)—CONSTRUCTION—CONSTRUCTION TO GIVE VALIDITY.

The claims of a patent must be read in the light of the description, and if the evidence indicates different constructions, that construction governs which will sustain the patent, rather than the one which will defeat it.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 231; Dec. Dig. ⬧157(2).]

5. PATENTS ⬧328—VALIDITY AND INFRINGEMENT—DRAFT RIGGING.

The O'Connor patent, No. 829,728, for a draft rigging, was not anticipated, and discloses invention. Claims 5, 6, and 7 also *held* infringed.

In Equity. Suit by William H. Miner against the T. H. Symington Company. On final hearing. Decree for complainant.

E. W. Hatch, of New York City, Louis Desbecker, of Buffalo, N. Y., and George. I. Haight and Joseph Harris, both of Chicago, Ill., for plaintiff.

Gilbert P. Ritter, of Washington, D. C., W. S. Symington, Jr., of Baltimore, Md., and Gibbons & Pottle, of Buffalo, N. Y., for defendant.

HAZEL, District Judge. Infringement by the defendant, the T. H. Symington Company, is alleged in the bill as to three letters patent, No. 668,655 and No. 668,656, both dated· February 26, 1901, to William H. Miner, and No. 829,728, dated August 28, 1906, to John F. O'Connor, all relating to improvements in draft rigging by which

railroad cars are coupled together, of a type generally known as tandem spring draft rigging. Structures of this character comprise a drawbar and yoke, with a U-shaped pocket strap, followers, stops, and cheek plates bolted to the inner sides of the sills for engaging the spring or shock-absorbing instrumentalities; the device being attached to the under frame of the car.

Tandem spring draft rigging was familiar to the art at the date of the inventions in suit; indeed, various types of draft rigging were old, namely, the single spring, the twin spring, and the tandem spring —the latter the type with which we are herein concerned. This type is provided with two spring or compression members, one arranged behind the other, each having a follower at its ends, while the connection between the gear and draft sills of the cars is effected through stops; the middle stop, in the patents in suit, being deeper than the end stops, and each follower being simultantously and independently operated.

As increasing railroad traffic from time to time demanded heavier cars, improvements in draft rigging and shock absorbers were necessary, in order to withstand the increasing shocks and blows to which the heavier cars were constantly subjected. The improvements, therefore, related principally to details of construction of one or more elements of the original combination, and tended towards increasing their strength and durability. All improvements or modifications had to conform to the standard dimensions specified by the Master Car Builders' Association, so that they could be used interchangeably on different cars; such dimensions being $12\frac{7}{8}$ inches in width, and $34\frac{1}{2}$ inches in depth. Therefore any alteration or modification, however slight, by which strength and durability were increased, would seem to require the skill and ingenuity of an inventor.

[1] The bill alleges that the defendant's draft rigging is an infringement of claims 4 and 5 of Miner patent, No. 668,655, and as claim 4 is fairly descriptive of the structure, it will be unnecessary to set forth claim 5. Claim 4 reads as follows:

"4. The combination with the drawbar, pocket strap, tandem arranged springs, and followers, of a pair of flanged steel draft beams, a pair of stop castings secured thereto, and each furnished with three stops and upper guide flange, a lower guide plate for the followers and the draft rigging to rest upon, extending between said draft beams and secured thereto by bolts passing through the lower flanges thereof, the upper guide flanges of said stop castings each tapering from the middle toward both ends to form a fulcrum for the pocket strap to swing upon, substantially as specified."

Claim 5 has substantially the same wording, save that it includes the phrase:

"Said guide plate having a central longitudinal channel for the lower member of the pocket strap."

In addition to the subject-matter, claim 4 specifies the following elements in combination: (1) A pair of stop castings; (2) a lower guide plate. The stop castings are secured to the draft beams, each being furnished with stops and having an upper guide flange "tapering from the middle toward both ends to form a fulcrum for the pocket

strap to swing upon." The lower guide plate element for the followers is extended between the draft beams by bolts, and has a central longitudinal channel for the lower member of the pocket strap, while the guide flange is made to taper from the middle towards both ends.

The involved claims are for a combination of old and new elements, and I think the patentee made a patentable improvement in the art by introducing as new elements the features of tapering the upper guide flange of the stop castings and of channeling the lower guide plate for the support of the followers.

The defenses are limitation of claims and noninfringement. Several prior patents were cited to illustrate the state of the art at the date of the invention, but not to anticipate it, and it is contended that a strict construction only of the disputed claims is warranted. In none of the prior patents however—patents to Miner, Nos. 570,038 (see model SX) and 549,207 (see model RX), to Roosevelt, to Perry, to Stark, to Brown, and to Jansen—is contained either the combination of the said claims or a near approach to the idea of the inventor, which obviously was to provide better means for withstanding the greater strains and shocks. While some of the elements of the claim are contained separately in one or more of the prior patents, they do not suggest the combination described in the Miner patents under discussion.

[2] Although the drawing attached to the patent illustrates a guide plate extending the whole length of the draft gear, the claims contain no limitation to the use of either a long or short guide plate. Besides, claim 2, not in issue, refers to a "lower guide plate extending from the front to the rear follower"—an obvious limitation, which, however, is excluded by claim 4, and cannot be read into it. Cadillac Motor Car Co. v. Austin, 225 Fed. 983, 141 C. C. A. 105.

The specification, speaking of the function of the middle stop, states that:

"Owing to the inclined inner edges $d^4$ of the guide flange $d^3$ of the stop casting and the greater depth of the middle stop $d^1$ over that of the end stops $d^2$, a fulcrum is formed at the angle of said inclined edges for the drawbar pocket strap to swing or turn upon, as required when the train is passing around curves."

Counsel for defendant contends that claims 4 and 5 must also be limited to this description of the guide flanges, and that, as defendant does not utilize in its draft rigging a stop casting which forms a fulcrum for the pocket strap at the angle of the edges of the drawbar, infringement is avoided; but defendant in its construction uses a center post with a flat bearing face, which I consider merely a colorable modification, as substantially the same result was attained as by complainant's fulcrum. Nor was infringement of claim 5 avoided by shortening the lower guide plate, which retained the lengthwise channel, so that it extended under only one of the followers, as the same result was secured thereby as in complainant's patent.

[3] Claims 2 and 8 of Miner patent, No. 668,656 read as follows:

"2. In a draft rigging, the combination with the draft timbers, and sill and body bolster, of a pair of draw bar stop castings fitting between and se-

cured at their backs to the draft timbers and abutting at one end against the end sill and at the other against the body bolster, substantially as specified."

"8. In a draft rigging, the combination with the drawbar, pocket strap, tandem arranged springs, and followers at both ends of both springs, of a pair of stop castings having each three stops for the followers to abut against; the middle stop at its portions above and below the follower guides being deeper than the end stops to form pivots for the drawbar and pocket strap to swing or turn laterally upon, substantially as specified."

As shown by claim 2, it was evidently the intention of the patentee to add strength to the castings by fitting them between the draft sills and riveting or bolting them thereto at their backs, so as to cause them to abut at one end against the end sill and at the other against the body bolster. But in my opinion there was no novelty at the date of the invention in thus attaching the cheek plates, as evidenced by the Car Builders' Dictionary, wherein it is stated:

"The castings for the drawbar stop are sometimes made long enough to bear against the body bolster, or a filling block interposed between it and the drawbar, thus relieving the lugs and bolts of strain."

Aside from this, the Roosevelt patent, No. 542,110, dated July 2, 1895, and the Ronemus patent, No. 545,096, dated August 27, 1895, and the Tomlinson patent, No. 545,555, dated September 3, 1895, contain descriptions of such an abutting arrangement. In the Tomlinson patent the draft sheets are firmly bolted to the center or draft sills and also to the sills $C$ and the bolster $D$, if desired, and the MacKenzie patent, No. 569,218, dated October 13, 1896, speaks of abutting the sections $a'$ of the plates at their respective ends against the body bolster $C$ and the end sill $B$. The Perry patent also specifies that the draft iron $E$ is made of such length as to connect the end sill $C$ and the bolster $D$. Hence, the defendant's construction, which does not abut at the ends of the castings, but has a space between the bolster and the end of the casting, is not an infringement of claim 2.

Claim 8 specifies a combination with front and rear pockets separated by a yoke thimble; a connection between the gear and draft beams of the car being effected through the medium of three stops, of which the central stop, upon which the yoke swings, is the deepest. The upper guide flange for bracing the middle stop, though tapering therefrom, to which form claim 4 is limited, is not specifically mentioned in claim 8; but such claim requires the middle stop to be made deeper than the end stops, both above and below the follower guide, to form a pivot for the drawbar and pocket strap to swing and turn upon.

[4] Defendant criticizes the claim for lack of clearness. The drawing, it is true, omitted certain reference numbers from the stops; but the specification in its entirety makes fairly clear that the portions $g^{10}$ $g^{10}$ are above and below the follower guides which are associated with the stop casting. The rule of law is that the claims of patents must be read in the light of the description, and if the evidence indicates different constructions, that construction governs which will sustain the patent rather than the one which will defeat it. McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800.

There is nothing found in Miner patent, No. 570,038, to invalidate said claim, although a lug or projection $g^8$ is shown at the middle of the casting, which was very much lighter than the present casting; but it was not a part of the central stop, nor was it deeper than the end stops, and such casting, having been built for a lighter car, was incapable of withstanding the increased shocks and strains. There are other important differences, but they need not be dwelt upon, inasmuch as I think that the patentee, in making the middle stop deeper than the end stops at its portions above and below the follower guides to form a pivot, strengthened the structure as a whole at a point where impacts and pulling were most severe. In the Weiss patent, No. 569,696, it is true, there are deeper stops, that is, deeper end stops; but such end stops were incapable of functioning to limit the swinging or turning movement of the yoke. The defendant's structure embodies the feature of a middle post deeper than the end posts in combination with the elements of claims 4 and 5 of Miner patent, No. 668,655.

[5] In the specification of the O'Connor patent its object is stated as follows:

"To provide a railway draft rigging side plate or stop casting of a simple, strong, efficient, safe, and reliable construction, and capable of successfully withstanding the enormous shocks or blows to which the draft rigging is subjected in actual and practical use."

It is shown that prior to such invention draft rigging had a tendency to break or give way at the side plates or castings, or at other points, and in this connection the specification says:

"Heretofore draft rigging side plates or stop castings have always been made of plates or webs of unequal thickness at different points, and especially at the intersection of the stop shoulders with the main plate or web of the stop casting, and I have observed that the breakage is most apt to occur apparently at those intersections or points where the metal is thicker."

To obviate these difficulties the patentee made a very much lighter casting than any prior castings, using less metal, distributing it evenly, and producing at the same time a stronger casting than had been produced before. He also introduced in his patent a stop casting without any T-sections—a feature not herein involved. The claims relied upon are the fifth, sixth, and seventh. The fifth claim is for the combination of elements, while the sixth relates to a side plate or stop casting, and does not embody the combination. Claim 7 differs from claim 6 in its inclusion of the words "further upright convolutions." Claim 6, which is typical, reads as follows:

"6. In a railway draft rigging side plate or stop casting, consisting of a cast web of substantially uniform thickness throughout, furnished with a series of upright convolutions therein forming stops or shoulders for the followers to abut against, and furnished with horizontal or longitudinal convolutions therein forming longitudinal strengthening ribs or flanges, said horizontal convolutions extending between, but not across, said upright convolutions, substantially as specified."

Not only did the patentee make the castings of substantially uniform thickness throughout, but he embodied in his invention certain bends or convolutions, extending them vertically to form the required stop shoulders for the followers to contact, and thus securing greater strength

in the stops affected by the blows and jars of the cars. He avoided substantially thickening the castings where the upright convolutions were caused to adjoin the. other parts of the castings. Complainant concedes that upright convolutions were not new, but contends that the additional element of the O'Connor claims, the horizontal bends or convolutions for longitudinal strengthening of the flanges, was new. Defendant concedes that the shoulders forming the contacts with which the follower co-operates were the convolutions in the web, but argues that the claims, properly construed, eliminate from stop castings the increased thickness due to the intersection of one web with another web.

Are the claims limited by the patents to Hinson, No. 636,431, to Jansen, No. 708,481, and to Miner, No. 754,669? There is nothing in the Hinson patent in the nature of a horizontal convolution or bend. There the back plate was straight, and lacked the strengthening means of the O'Connor patent, and besides it was not formed of relatively thin metal uniform throughout, which at the same time maintained the appearance of great thickness. The Jansen patent is a close approach to the O'Connor patent, and there is similarity between it and defendant's cheek plate; but an inspection of defendant's Exhibit BX will disclose that the Jansen patent lacks a substantial uniformity of thickness of metal throughout, being noticeably thicker at the end stops near the followers. There is also another important difference, namely, the plainness of the Jansen plate on the back; the horizontal bends or convolutions of O'Connor, to strengthen the ribs of flanges, being absent. Neither does the Miner patent, No. 754,669 describe a web of uniform thickness or a casting containing a horizontal bend or convolution to strengthen the rib or flange. There is nothing in the prior art patents to warrant a close scanning of the claims in suit, or a construction limiting them to a mere removal of thicknesses of the web at points of intersection with another web.

The appearance of complainant's and defendant's castings is somewhat different, yet the defendant in my view employs the series of horizontal bends or convolutions, as well as the vertical convolutions forming the stops. It makes no difference that in defendant's structure a portion of one of the vertical convolutions ceases at the middle post, inasmuch as an additional horizontal convolution takes its place. The defendant secures the same beneficial result by its adaptation and appropriation as does the complainant. While claims 5 and 6 are limited to horizontal bends or convolutions "extending between, but not across," the upright convolutions, claim 7 contains no limiting language. It was further urged that the effect of the horizontal convolutions and the vertical convolutions was to form flanges. There is no point to the claim that the main stops in defendant's structure are flanges, and not convolutions of one type or another.

In view of the foregoing, it is unnecessary for me to pass upon complainant's allegation and testimony that the defendant procured skilled labor from the manufacturer of complainant's structure for the purpose of facilitating acts of infringement.

Complainant may have a decree, with costs, holding claims 4 and 5 of Miner patent, No. 668,655, claim 8 of Miner patent, No. 668,656,

and claims 5, 6, and 7, of O'Connor patent, No. 829,728, valid and infringed, and claim 2 of Miner patent, No. 668,656, invalid for want of novelty.

⬮For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes