## DYKEMA v. LIGGETT DRUG CO., Inc.
### No. 1967.

District Court, W. D. New York.

April 2, 1937.

Supplemental Opinion May 10, 1937.

314

See, also, 12 F.Supp. 1007; 12 F.Supp. 1008.

Locke, Babcock, Hollister & Brown, of Buffalo, N. Y., and Byrnes, Stebbins & Blenko, of Pittsburgh, Pa. (Edward Hoopes, 3rd, and George E. Stebbins, both of Pittsburgh, Pa., and Harold S. Brown and Max D. Farmer, both of Buffalo, N. Y., of counsel), for plaintiff.

Dudley, Stowe & Sawyer, of Buffalo, N. Y. (Watson, Bristol, Johnson & Leavenworth, of New York City, James F. Hoge, Lawrence Bristol, and David A. Woodcock, all of New York City, of counsel), for defendant.

KNIGHT, District Judge.

This is a patent suit which charges infringement of claims 2 to 9, inclusive, of Dykema reissue patent No. 19,520, granted April 9, 1935, for which application was filed January 29, 1935. The original patent No. 1,843,812 was granted February 2, 1932, upon an application filed February 7, 1931. Claims 2 and 4 in issue are identical with the same numbered claims of the original patent. Claim 3, as amended, and claims 5 to 7, inclusive, were included in the application for the reissue and claims 8 and 9 were added in the proceedings in the Patent Office for the reissue patent.

The invention relates to a "bottle closure and liquid dropper" referred to throughout the trial as a "fitment." The complaint charges the unauthorized sale of this fitment and also of the combination of such fitment with the bottle. The answer alleges invalidity by reason of anticipation by prior patents, lack of invention, lack of disclosure, and supporting oath and noninfringement.

The ordinary medicine dropper of bulb and tube has been known for many years. In its early use the cork of the bottle was removed, the tube of the dropper inserted, filled or emptied by squeezing the bulb of the dropper, and then removed from the bottle and the cork replaced. It is apparent that there are certain disadvantages in such use. Among these are liability to loss of parts, damage to the tube, contamination, and unnecessary disorder in the use. The art has developed in the direction of overcoming these disadvantages,

and today devices such as described in the patent in suit and somewhat similar ones are in common use.

The plaintiff claims he conceived the idea of his invention in 1928, and that it was developed from the so-called "Barnes" combined dropper and stopper in use since about 1916. Other patented devices showing a dropper in combination in use with and insertible through a bottle cap top were disclosed prior to 1928.

The invention claimed is said to lie in a fitment in which the cap and dropper are frictionally engaged whereby they move together as a unit upon removal from the bottle. All of the elements of plaintiff's device are set up in claim 9 of the reissue. That claim reads:

"A combined bottle closure and liquid dropper comprising a rigid cap having a central opening in it and adapted to fit over and form a cover for the top of a bottle and a liquid dropper consisting of an externally flanged elastic bulb having a dropper tube engaged in an open neck forming the bottom of the bulb, the diameter of said opening in the cap being at least approximately as great as the external diameter of the upper or squeezing portion of the bulb, one of said tube and neck being provided with a groove and the other thereof being provided with a flange interengaging said groove, the external flange of the bulb being disposed substantially at the bottom of the bulb so that no substantial portion of the bulb extends down into the bottle and about the region of the interengaging portions of the tube and neck to enhance the engagement therebetween and being of such diameter as to seat on the bottle to seal the same upon application of the cap thereto, said bulb being extended upwardly through the opening in said cap with the dropper tube projecting there below and the body of the bulb frictionally engaging the cap whereby adapting the dropper to move with the cap as a unit."

Plaintiff's original application contained a single claim. It included no claim to frictional engagement or unitary structure, but it did state that the tube and bulb flange were interengaged by a groove in the periphery of the flange and a bead on the upper end of the tube. Before action in the Patent Office, claim 2 was added. This was identical with claim 1, except that it provided for alternative methods of interengagement between the bulb flange and the upper end of the tube. Both of these claims were rejected as unpatentable over Rodiger No. 463,215 issued in 1891, in view of Fitzsimmons No. 726,038 issued in 1903. The Patent Office also gave Kerner No. 328,122 issued in 1885 as a reference. There can be no doubt that original claims 1 and 2 were unpatentable over these references. Fitzsimmons taught the seating of the bead of the dropper in a groove of a flange of a bulb, and Kerner taught the seating of the bead of the dropper in the bulb immediately above the flange of the bulb. It would require only mechanical skill to change from the teaching of the last two mentioned patents to the engagement shown in claim 2. Rodiger shows every other essential element of claims 1 and 2 as they were in their original forms.

Prior to the filing of his original application, plaintiff had been advised by his attorneys, who did subsequently file the application, that in their opinion Rodiger anticipated the then proposed invention. In September, 1931, plaintiff amended his application to strike out the word "removably" in claims 1 and 2 and insert, following the word "associated," the words "removably as a unit" and also striking out the word "and" last appearing in each claim and inserting "to be frictionally engaged by said cap, and said flange."

As amended, claim 2 read, in part:

"said bulb passing upwardly through the aperture in said cap with sealing flange surrounded by said skirt and engaging the top of said cap to be frictionally engaged by said cap, and said flange forming with lip of said neck the sole seal for the container when the neck is engaged by the cap."

As so amended, the claim appears in the reissue patent. Plaintiff asserts that amended claim 2 calls broadly for the bulb as being frictionally engaged by the cap. Defendant asserts that it calls for frictional engagement only between the periphery of the flange and the interior of the skirt of the cap. It seems to me that this particular claim calls for engagement between the flange and the cap and that the engagement referred to is at the point of contact of the periphery of the flange and the skirt of the cap. However, it will make no change in the result whichever interpretation is adopted. Rodiger does not show a unitary structure or interengagement between the head of the bulb and the

rim of the aperture in the cap or a flange frictionally engaged by the cap.

Claims 3 and 4 were added to the original application in the Patent Office. They differed from claims 1 and 2 with respect to the description of the frictional engagement between the members of the combination in this respect. Claim 3 then read: "The body of the bulb frictionally engaging the cap whereby adapting the dropper to move with the cap as a unit." Claim 4 describes the flange of the bulb as being "adapted to frictionally engage the skirt of the cap in such a way as to cause the cap and dropper to move as a unit when the cap is removed from the bottle." Claim 3, as amended in the reissue application, discloses the alternative method of interengagement between bulb, flange, and tube included in claim 2 and also discloses another feature not theretofore specifically described or claimed. The latter is found in this language: "The external flange of the bulb being disposed about the region of the interengaging portions of the tube and neck to enhance the engagement therebetween."

Claim 5 limits the thickness of the flange of the bulb by describing it as "disposed substantially at the bottom of the bulb so that no substantial portion of the bulb extends down into the bottle." This limitation appears only in claims 5 and 9. Claim 6 adds this new limitation in describing the dropper tube as "grippingly engaged in an open neck forming the bottom of the bulb." Enhancement of engagement between tube and neck is here claimed, as in claims 3 and 9. Claim 7 contains no element not found in one of the prior claims. Claim 8 defines a structure with a cap opening "approximately as great as the external diameter of the upper squeezing portion of the bulb." Here we find the first limitation of the size of the opening in the cap. This claim sets out the alternative methods of engagement between flange and tube. Claim 9 is more limited than claim 8. It fixes the diameter of the opening of the cap. It describes the alternative method of engagement between tube and flange, limits the thickness of the flange of the bulb, and, as in claims 3 and 6, describes enhancement of the engagement between tube and neck.

In the foregoing references to elements of the various claims, I have included only such as are claimed to be new and novel. Each claim describes a combination of a dropper and bottle cap, in which the squeezing portion of the bulb of the dropper is extended upwardly through an opening in the cap and in which the said bulb has a flange at its lower end which seats on the top of the bottle to cover the opening and in which flange a glass tube, extending down into the bottle opening, interengages.

"Frictional engagement," as it is to be construed here, means such contact between surfaces of two bodies so placed that in the separation of them one surface will necessarily be drawn across the other thus creating a rubbing effect which requires the exertion of some force to separate the two bodies. Claim 4 definitely fixes the point of engagement as between the flange of the bulb and the skirt of the cap. Claim 2 fixes the engagement as being between the flange and the skirt of the cap. Each of the other claims is limited to frictional engagement between the body of the bulb and the cap.

Doubt is sought to be thrown around the meaning of the words "body of the bulb." Plaintiff asserts that it refers to the entire rubber portion of the structure. Defendant contends that it is to be construed as including only the flange. The "frictional engagement" in all claims must be either at the point of contact between the periphery of the flange and the side or skirt of the cap, or at the point of contact between the upwardly extending portion of the bulb and the periphery of the opening of the cap. If the "body" of the bulb means the "flange," certain of these claims do describe frictional engagement between the body of the bulb and the cap. Further, in so far as certain of the claims give the diameter of the opening in the cap as at least approximately as great as the external diameter of the upper or squeezing portion of the bulb, frictional engagement is sufficiently described. This is particularly true when the claims are read in the light of the specifications and the drawings. The specifications and drawings of the original patent support the granting of such claims in the reissue patent.

Defendant admits the sale of the structures claimed by plaintiff to infringe. The defendant has made proof of numerous patents ante-dating Dykema. With the exception of a few, they have been offered to show the development and state of the art. Reliance is placed mainly on Rodiger, Steiner, and Fitzsimmons, supra, as anticipating Dykema. For the purpose of

clarity, diagrams of the Barnes stopper, and defendant's admitted structures are the Dykema, Rodiger, and Steiner devices here shown:

Rodiger Pat. 463,215
(Fig. 7)

Dykema Pat. 1,843,812
(Re. 19.520)

Barnes Stopper

Steiner Pat. 1,362,053

318

*Juris J. Dykema,*
*—vs——*
*Liggett Drug Company, Inc.)*
*Equity No. 867.*

In the Dykema drawing numeral 1 shows the elastic bulb; 2, the opening in the lower end of the bulb; 3, the outwardly extending flange; 4, the grooved periphery in the inner surface of the flange; 5, the bead ·head on the glass dropper; 6, the glass dropper; 7, the skirt of the bottle cap; 8, the bottle neck; 9, the bottle; 10, the flange at the top of the cap.

Rodiger shows a bulb, b' extending through and above and below the bottle cap; a dropper, b connected with the bulb; bottle neck, a', screw cap, E, and e,[3] an inwardly extending flange on the cap, and an outwardly extending flange on the bulb at the lower end, being part of the bulb and extending no substantial depth into the bottle neck. No frictional engagement between bulb or flange and the cap is shown. Rodiger does not disclose a tube interengaged with the bulb flange. The bead of the tube is seated above the flange. Barnes, Kerner, and Fitzsimmons, supra, however, clearly teach an engagement which is the equivalent of that shown by Dykema as regards such interengagement.

Barnes shows a dropper comprised of a rubber bulb and a glass tube suspended from its interior. The bulb has a flange at its midsection which seats over the top of the bottle. The bulb below the flange extends into the bottle neck. The tube is held in place at its upper end by its bead which is engaged in a groove in the flange of the bulb. The bulb acts as a stopper. It shows no separate cap.

Defendant's structure No. 1 is Exhibit No. 1 in evidence; No. 5 is Exhibit No. 2 in evidence; No. 4 is Exhibit No. 3 in evidence; No. 7 is Exhibit No. 4 in evidence; No. 3 is Exhibit No. 5 in evidence; and No. 6 is Exhibit No. 6 in evidence.

Defendant's structure, shown above as No. 1 (Plaintiff's Exhibit No. 5 in evidence), does not infringe any of the claims. It discloses no frictional engagement between the periphery of the flange and cap or between the squeezing portion of the bulb and the flange of the cap to make a unitary structure. Such engagement as is found is between the flange and the thread of the cap. This is not a frictional engagement. Plaintiff's specifications recite that the flange of the bulb engages the bead of the dropper and each of plaintiff's claims shows one of such parts grooved and the other flanged to secure them in the proper relation to each other. Like Kerner and Rodiger, defendant shows a bead above the rubber flange. The patent examiner correctly said that: "To seat the bead of the dropper member in a groove as taught by Fitzsimmons would require only mechanical skill." The same expression is applicable to a device showing interengagment between a groove in the dropper tube and a flange in the neck of the bulb.

What has been said with reference to defendant's structure No. 1 is equally applicable to structure No. 4 (Exhibit No. 7). Indeed, much less question of infringement can arise, since the diameter of the upwardly extending portion · of the bulb throughout its length is much less than the diameter of the opening in the cap. What has been said with reference to structure No. 1 is likewise applicable to structure No. 5 (Exhibit No. 6). In addition, this structure as well as structures Nos. 6, 7, and 8, shows an interlocking between the bulb and the cap by means of a shoulder on the upwardly extending portion of the bulb, which finds its equivalent in Steiner. Structure No. 7 (Exhibit No. 8) is equivalent in all material respects to structure No. 5 (Exhibit No. 6), except that the flange of the cap closely engages that portion of the bulb between the sealing flange and the locking flange. The use of the

locking flange takes the structure without the scope of the claims of the patent.

The record discloses no physical exhibit of structures Nos. 2 and 8. It is apparent that structure No. 8 shows all of the features of structure No. 6 (Exhibit 10) and No. 7 (Exhibit 8).

Steiner shows a screw threaded cap mating with a screw threaded bottle neck and with a central opening in which a rubber bulb is mounted. This bulb has a flange which serves as a "sole seal for the container when the neck is engaged by the bottle." It shows a dropper tube mounted in the bulb and depending below into the bottle. The lower part of the bulb extends below its flange and the tube is held in place in this lower part of the bulb below the flange. Steiner shows a combination of a screw cap bottle closure and a liquid dropper. Its unitary quality results from the engagement of the top of the cap between the top of the flange and a bead or rib on the bulb just above the cap hole. These parts are thus interlocked. Steiner does not show frictional engagement between bulb and cap as a necessary feature in the unitary structure. With respect to this method of interlocking, Steiner is the equivalent of defendant's structures 5, 6, 7, and 8. None show frictional engagement as disclosed by Dykema.

Assuming, as is here found, that Fitzsimmons anticipates as regards interengagement between the tube and the flange, the defendant does not infringe as respects these four structures. The main claim for Steiner is that it shows a unitary structure. The patent so specifically describes it, but the method of construction to make it unitary is entirely different from Dykema. There is another Steiner patent No. 1,304,115, but, because of the closeness in comparison with No. 1,362,053, it has not been deemed necessary to describe it. Structure No. 3 (Exhibit No. 9 in evidence) shows all of the elements of each of the claims in suit, except claims 2 and 4. There may be some doubt about this, but it appears that it does not show frictional engagement between the flange of the bulb and the cap. It does disclose frictional engagement between the body of the bulb and the cap at the point where they contact each other at the opening of the cap. It is the frictional engagement at this point which makes the structure unitary. The structure discloses interengagement

between the tube and the flange, since the diameter of the opening in the cap approximates the external diameter of the upper or squeezing portion of the bulb. Structure No. 2 infringes all claims except 8 and 9 differing from structure No. 3 (Exhibit 9) in that it discloses frictional engagement between the periphery of the flange and the side of the cap and not between the bulb and the periphery of the top flange of the cap. These two structures Nos. 2 and 3 infringe, provided plaintiff's device is patentable. Indeed, the defendant makes the issue of infringement a secondary one. Several reasons are urged against the patentability of the plaintiff's structure. The most persuasive of the reasons given against patentability is that it required only mechanical skill to change Rodiger into Dykema. The only physical things necessary to accomplish this are the extension of the bulb flange out against the side of the cap and the narrowing of the opening in the top of the cap to the approximate size of the upwardly extending part of the bulb. The fact that the upward extending portion of the bulb is not of uniform diameter may not be material. The difference in the methods by which the tube is held in place is material. Either method may be said to be so devised as to "enhance" the engagement between the parts.

The evidence establishes the fact that Dykema conceived the idea of his device in the latter part of 1928, and that in 1930 he was active in experimenting and procuring material for such device; that during that year he made a drawing of and produced a fitment substantially as shown in the patent; and took steps directed to the manufacture and sale of such fitments.

The evidence establishes the fact that Dykema antedated Milburn patent No. 1,870,780, granted August 9, 1932, application filed August 26, 1929; Bowman & Fentress patent No. 1,875,325, granted September 6, 1932, application filed February 25, 1930, and a dropper advertised by Vicks in January, 1931. These two patents relate to dropper and closure devices. On the application for his reissue, Dykema swore back of Milburn. Frictional engagement originally was not claimed by Milburn. In February, 1932, a claim worded in practically the identical words used in Dykema's claim 3 made on December 16, 1931, was included. The Vick

dropper of 1931 in outward appearance seems to have generally the form of Dykema.

For a period, from March, 1934, to April, 1935, Dykema owned both the Milburn and the Bowman & Fentress patents. It is claimed that the failure of Dykema to disclaim Milburn's claim 3 shows such inequitable conduct as might bar relief though the patent were otherwise valid. No such disclaimer was necessary. The failure to file a disclaimer as to Milburn could not affect the validity of Dykema. 35 U.S.C. § 65 (35 U.S.C.A. § 65). The law is well settled that it is not necessary to file a disclaimer until there has been a judicial determination that the claim is invalid. Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949; Excelsior Steel Furnace Co. v. F. Meyer & Bro. Co. (C. C.A.) 36 F.(2d) 447; Ensten v. Rich-Sampliner Co. (D.C.) 13 F.(2d) 132. It seems to me this rule of law is applicable though the patents involved are owned by a single party. Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp. et al., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005, and Ensten v. Simon, Ascher & Co., 282 U.S. 445, 51 S.Ct. 207, 75 L.Ed. 453, cited by defendant, have no application to the facts shown here.

It is claimed that the patent in suit is invalid for lack of disclosure or supporting oath. The statute requires that the inventor shall make "a written description * * * in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to make * * * the same." U.S.C., title 35, § 33 (35 U.S.C.A. § 33). It also provides that the applicant shall make an oath that he is the original and first inventor. U.S.C., title 35, § 35 (35 U.S.C.A. § 35). The test of invalidity by reason of lack of disclosure is whether a claim is fairly derivable from the sworn disclosure. Westinghouse Electric & Mfg. Co. v. Metropolitan Electric Mfg. Co. (C.C.A.) 290 F. 661. Claim 2 shows an alternative method of interengagement between the top of the dropper tube and the flange of the bulb, while claim 1 describes a single method of interengagement. It seems to me that claim 2 is fairly derivable from the sworn original disclosure, and, further, as claimed by the plaintiff, plaintiff might have invoked the doctrine of equivalents without amendment. It is claimed that the amended claims including "enhancement" of the engagement between tube and bulb are likewise invalid. Such enhancement necessarily is measured to some extent by the width of the flange. The original specifications together with the drawing show such a combination of flange and tube as to indicate enhancement. Claim 4 in the original patent includes enhancement of such engagement and is fairly derivable in this respect from the original specifications and drawing when taken together.

The original claim 1 included no reference to engagement of the body of the bulb with the cap. Reissue claim 2 speaks of the flange as engaging the cap. All the other claims speak of engagement between the "body of the bulb" and the cap. Defendant claims that there is no basis in the original disclosure for interpretation for any of the claims broadly enough to cover frictional engagement between the bulb and cap elsewhere than between the periphery of the flange and the interior of the skirt of the cap. The original application reads: "The stopper-dropper is assembled for use by forcing bulb 1 upwardly through aperture 11 to seat flange 3 within the cap against top 10." Illustrative of this declaration is the drawing of the patent showing the flange of the bulb extending the entire width of the cap and the upwardly extending bulb in close proximity of the edge of the opening in the cap and approximately the size of the opening. It seems to me that the specifications and the drawing are sufficiently comprehensive to entitle the applicant to claim frictional engagement between the upwardly extending portion of the bulb and the opening in the cap. T. H. Symington Co. v. National Malleable Castings Co., 250 U.S. 383, 39 S. Ct. 542, 63 L.Ed. 1045; Miner v. T. H. Symington Co. (D.C.) 238 F. 806.

All of the amendments in the original application were derivable from the original specifications and claims. The only other new matter to which it is necessary to refer is that shown in claims 8 and 9 wherein it is claimed that the diameter of the upwardly extending portion of the bulb is approximately the same as the diameter in the opening in the cap. Each of these claims reads upon the disclosure of plaintiff's drawing and is fairly derivable from the original specifications. As regards all new matter appearing in the reissue patent, the reissue oath takes the place of supple-

mental oath under rule 48. Kwik-Set, Inc., v. Welch Grape Juice Co. (D.C.) 14 F. Supp. 137.

Defendant's structure No. 2 infringes 2 to 9, inclusive, and structure No. 3 (exhibit 9) infringes all of such claims except claims 2 and 4.

Was the creation of plaintiff's device invention? It seems to me it was. Several reasons support this conclusion. A presumption of patentability arises from the issuance of the patent. The applications herein seem to have had extensive investigation in the Patent Office. The patent is a simple one. Simplicity does not deny patentability. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S. Ct. 698, 46 L.Ed. 968. The vision clears after demonstration. Numerous combination dropper and filler patented devices in evidence demonstrate this. Despite the need, no one devised a combined bottle and closure structure made unitary by frictional engagement for many years prior to Dykema. As said by Judge Hand in H. C. White Co. v. Morton E. Converse & Son Co. et al. (C.C.A.) 20 F.(2d) 311, 313: "We see in this an invention just because, being so simple, it had not occurred to any one before. The fact that the changes were so slight is quite irrelevant, so long as they were essential to the purpose, as they were. While the statute grants monopolies only for new structures, and not for new uses, invention is not to be gauged by the necessary physical changes, so long as there are some, but by the directing conception which alone can beget them. * * * That was certainly absent before it came to White's mind."

Nothing in the prior art shows a combined dropper and closure structure of this form made unitary by frictional engagement. The patentability over Rodiger is not denied. Dykema shows new, novel, and useful uses for which Rodiger and prior patents or devices were not suited. Dykema satisfied a want not met theretofore by those skilled in the art. This is strong evidence of patentability under the facts in this case. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997. While the prior art shows certain of the elements or parts of the Dykema combination combined in the same general way as Dykema, all lack the element of "frictional engagement" as shown by Dykema in a unitary structure.

That patentability appears to be recognized by the makers of combination droppers and fillers, is shown by exhibits of their products in evidence and also by numerous types of defendant's structures. The drawings herein show the defendant's varieties. The Mistol, Pureco, Dolph's Sabalol, Lilly, Abbott, UpJohn, and other combined droppers and closures in evidence, disclose combinations made in slightly different forms from Dykema. Certain of these are patented and certain are not. E. R. Squibb & Son, Parke Davis & Co., UpJohn Company, Abbott Laboratories, Stanco, Inc., McKesson and Robbins, large manufacturers of nasal preparations, use the Dykema device. This bespeaks a measure of supremacy. Plaintiff's device has had a great measure of commercial success. The record discloses that in five years upwards of 27,500,000 of plaintiff's devices were sold. This is evidence of invention. Washburn & Moen Mfg. Co. v. Norwood, 143 U.S. 275, 12 S.Ct. 450, 36 L.Ed. 161; Paramount Publix Corp. v. American Tri-Ergon Corp., supra; Minerals Separation v. Hyde, 242 U.S. 261, 270, 37 S.Ct. 82, 61 L.Ed. 286; Franc-Strohmenger & Cowan, Inc., v. Siegman, Inc. (C.C.A.) 27 F.(2d) 785.

In 1930 Eli Lilly dedicated to the public the Stuart patents covering a method for the use of ephedrine in an oily solution. The value of ephedrine for the treatment of nasal membranes by reducing the swollen tissues was known long prior to these patents. Its availability for use in oil was not. Therefore, these oily preparations for the nose had been generally administered in the form of a spray through atomizers and nebulizers. There can be no question that this new preparation brought increased demand for the dropper. It is reasonably probable that these large concerns using Dykema's device found a considerable increase in the demand for their products. The consequent increased demand by them for the dropper is a test of the worth of Dykema's device.

Plaintiff's device is not invalid by reason of anticipation. It is necessary to consider only one structure. The only prior patent pleaded as anticipating is Rodiger. Steiner, as evidenced by the Deluca hydrometer in evidence, is set up in the answer to show the prior art. Rodiger does not teach or disclose unitary structure. Rodiger does not show a fitment disclosing any frictional engagement between bulb

and cap. Steiner discloses a combination made unitary by the interlocking of two flanges rather than by frictional engagement. These are the definite features which distinguish Dykema, Rodiger, and Steiner. If the conclusion is correct that the frictional engagement feature of Dykema in combination with its other parts was patentable, nothing further need be said as regards these prior patents. Rodiger seems to have been a so-called paper patent. There is no proof that it was ever put to use or on the market. Steiner's device is a hydrometer. It is evident that the latter could not have been advantageously used as a dropper for oily liquids. Numerous other patents were introduced in evidence to show the state of the art. It is not claimed that these met the precise language of the Dykema claims. Kirkpatrick, No. 377,034, is claimed to provide an airtight cap for a glue container, a brush being inserted through the cap. It shows a unitary structure in which the brush handle is held in frictional engagement in a rubber plug interlocked with a screw cap top. Butz, No. 586,011, is a patent for improvements in nursing bottles, and shows a rubber nipple extending over the bottle top, held down by a clamp. Meier, No. 590,708, is also claimed to be an improvement in nursing bottles and nipples. It shows the nipple interlocked with a screw cap. Woodruff No. 1,455,158, is a combination of bottle cap and brush holder, showing a cap which screws down on a so-called rubber washer which is engaged by a shoulder attached to the brush handle. Deegan, No. 1,693,371, a nipple invention, shows a nipple having a flange which seats on top of the bottle and is held in place there by a screw cap. It shows no dropper tube. Hopkins, No. 515,587, is called a bottle stopper and ink filler. It shows a rubber stopper extending into the bottle neck. In general form it conforms to Barnes. No one of these patents shows the invention defined by the claims in suit. No one is in such form that it could be made in the form of the Dykema device. No one is in such form that from it a mechanic, ordinarily skilled in the art, could normally and naturally devise a structure equivalent to that of Dykema. Certain features of the patents heretofore mentioned suggest parts of Dykema, but the combination of such parts, though old, in a new way so as to produce a new and useful result, is patentable.

Findings of fact and conclusions of law in accordance with this opinion follow and are made a part hereof:

### Findings of Fact.

1. Plaintiff is the first to provide a fitment of the type disclosed in the patent in suit with the bulb of the dropper frictionally engaging the cap so as to cause the cap and dropper to stay together as a unit when the fitment is removed from the bottle and resist forces tending to separate the cap and dropper.

2. Plaintiff's fitment accomplishes important new and useful results over the devices heretofore used for a similar purpose.

3. The Barnes stopper has no cap to hold the stopper in place with respect to the bottle; moreover, the flange of the Barnes stopper does not seal the bottle as in plaintiff's fitment.

4. In the Barnes stopper the glass tube is firmly gripped by the lower or plug portion of the bulb so that the flange is not relied on to enhance the engagement between the tube and bulb.

5. When the Barnes stopper is attempted to be used with oily substances, it will not stay in the bottle neck at all, but is ejected as demonstrated at the trial.

6. The external flange on the bulb of plaintiff's fitment has entirely new and different functions than the flange of the Barnes stopper.

7. In plaintiff's fitment, the flange is relied on to enhance the engagement between the interengaging portions of the tube and bulb, as there is no plug portion for holding the tube in plaintiff's fitment as there is in a Barnes stopper.

8. Rodiger patent No. 463,215 does not disclose or teach frictional engagement between the cap and bulb.

9. Consideration of the Rodiger patent as a whole makes clear that Rodiger intended the cap to be removed from the bottle separately from the dropper.

10. The enlarging of Rodiger's flange to frictionally engage the skirt of the cap is not obvious in view of the prior art, but, on the contrary, is suggested by the patent in suit.

11. There is no teaching in the prior art to use of the Rodiger device with oily substances or that the Rodiger fitment would become a tight fit if used with oily substances.

12. Defendant's bottles, Exhibit K, are not produced in accordance with the teaching of Rodiger and do not represent Rodiger's fitment.

13. Even if Rodiger's flange should swell in oil in the manner suggested by defendant, this would not produce either plaintiff's or defendant's structure as both plaintiff and defendant employ an initially tight fit which has the advantage of maintaining the fitment unitary when originally packed in the carton separately from the bottle.

14. The Steiner patents Nos. 1,304,115 and 1,362,053 do not teach plaintiff's invention.

15. In Steiner, the cap and bulb are positively locked together as distinguished from being frictionally engaged.

16. In Steiner the bulb flange is above the lower extremity of the bulb so that a portion of the bulb extends down into the bottle whereby the glass tube is insecurely held and likely to drop out of the bulb, especially if the lower portion of the bulb swells.

17. The Steiner hydrometer is not suitable for use with oily substances.

18. No one prior to plaintiff had the insight to perceive that frictional engagement between the cap and dropper was what was needed; Rodiger taught a loose fit; Steiner taught a positive interlock; consequently the combination of Rodiger and Steiner could not teach frictional engagement which neither disclosed.

19. Fitzsimmons patent No. 726,038 is not in the record; in any event, it does not teach a fitment having flange and groove interengagement between the tube and bulb enhanced by an external flange on the bulb.

20. The combination of Fitzsimmons and Rodiger is not taught or suggested by the prior art and could not be effected on the basis of the disclosures of these patents.

21. The patents to Kirkpatrick (No. 377,034), Butz (No. 586,011), Meier (No. 590,708), Woodruff (No. 1,455,158), Deegan (No. 1,693,371), and Hopkins (No. 515,587) do not anticipate the invention of the patent in suit or contain any teaching leading toward the same; these patents, moreover, are mere "paper patents" so far as the record shows.

22. The newspaper advertisements, Defendant's Exhibits W and X, do not disclose the invention; there is no disclosure whatever in such advertisements of the interior structure of the fitment.

23. There is no showing that defendant sold any of its fitments in suit prior to plaintiff's filing date.

24. Plaintiff conceived the invention of the patent in suit in October, 1928.

25. Plaintiff reduced to practice the invention of the patent in suit prior to the end of the year 1928.

26. Plaintiff exercised due diligence in reducing the invention to practice and in afterward commercializing the invention.

27. Plaintiff is entitled to an effective invention date of October, 1928.

28. Milburn, Bowman, and Fentress and the Vick newspaper advertisements, Defendant's Exhibits W and X, are all subsequent in date to plaintiff's invention and hence have no bearing on the issue.

29. Plaintiff's fitment has met with great commercial success.

30. Vick Chemical Company is participating in the defense of this suit and is paying counsel for the defense of this suit.

31. Mr. Bristol's testimony at pages 71 to 75, inclusive, of the record does not relate to privileged communications between attorney and client.

32. There is nothing illegal, fraudulent, or in any way improper in the agreements between plaintiff and Stanco, Inc., and between plaintiff and Owens-Illinois Glass Company.

33. Plaintiff's commercial success is not shown to have been due in any substantial measure to any factor or factors other than the merit of plaintiff's fitment.

34. The record does not show disregard of the patent in suit by the trade generally.

35. The record does not show that the Patent Examiner was ignorant of the Steiner patents.

36. Plaintiff's original patent was not issued by reason of misunderstanding or misinterpretation of the Rodiger patent by the Examiner.

37. Claims 8 and 9 of the patent in suit are not inconsistent with the disclosure or the other claims of the patent.

38. Plaintiff is sole owner of title to the patent in suit, reissue Letters Patent No. 19,520, which was granted to plaintiff April 9, 1935, upon a reissue of United States Letters Patent No. 1,843,812 orig-

inally issued to plaintiff February 2, 1932, upon an application filed February 7, 1931, the application for reissue having been filed January 29, 1935.

39. The claims of the patent in suit relate to an alleged invention of mounting a liquid dropper in the cap of a bottle, in order to make the two unitary (i. e., in such manner that they remain attached whether the device is serving as a bottle closure or has been removed from the bottle and is serving as a liquid dropper).

40. Both the original Dykema patent No. 1,843,812 and the reissue patent in suit No. 19,520 are shown by the file wrappers of their applications to have been granted without citation by the Patent Office examiner of the prior Steiner U. S. Patents Nos. 1,304,115 and 1,362,053 or any other prior art which disclosed the unitary combination of a bottle cap with a liquid dropper or with any other device, unless it be the application of the Milburn U. S. Patent No. 1,870,780 which was removed from the examiner's consideration by Dykema's affidavit alleging his own invention before August 9, 1929, Milburn's filing date.

41. The said patents to Steiner Nos. 1,-304,115 and 1,362,053 had each disclosed the unitary combination of a screw cap bottle closure and liquid dropper more than two years prior to the filing of the said original Dykema application and prior to his alleged invention.

42. Ease of disassembling the parts is not mentioned or claimed in the patent in suit, nor necessarily produced thereby, and is not shown to have any utility.

43. During the pendency of the original application for Dykema patent No. 1,-843,812 the prior Rodiger patent was cited, but plaintiff's attorney misstated to the patent examiner the disclosure of Rodiger by saying that it required a stopper member in the bottle neck, whereas in fact the Rodiger patent states that such a stopper may be omitted.

44. Prior to the alleged invention of the patent in suit, there had been public knowledge and use of the Barnes stopper which was a unitary dropper closure having a glass dropper tube centrally mounted in a rubber bottle closure, the latter consisting of a rubber bulb having an outwardly extending flange adapted to seat on the neck of a bottle of proper size, and a rubber stopper fitting like a cork within the neck of the bottle, the connection between the glass dropper and the rubber member being by means of a glass bead at the upper end of the dropper tube engaging an annular groove in the inner edge of the rubber flange.

45. At and prior to the alleged invention by plaintiff there was public knowledge and use of bottles having screw necks, and screw caps of metal or other rigid materials adapted to fit the same, and washers adapted to fit frictionally within the top of such caps and to extend over the top of the bottle neck to serve as the sole seal when the cap was screwed upon the bottle.

46. Plaintiff testified that he reduced his alleged invention to practice by taking an ordinary screw bottle cap and a Barnes stopper having a flange of size to fit within the cap, putting them together by cutting a hole in the center of the bottle cap, and pushing the squeezing portion of the bulb through it and cutting off the rubber stopper portion below the flange.

47. On February 27, 1894, more than two years prior to the filing of the original application for the patent in suit, and prior to the alleged invention thereof, United States Letters Patent were granted to Hopkins No. 515,587, for a device in which a liquid dropper was held in unitary arrangement in the central opening of a bottle closure and in which a rubber flange integral with the bulb of the liquid dropper extended as a seal between a metal cap and the bottle neck.

48. More than two years before the application for the original patent in suit and prior to the alleged invention thereof, it was old to provide a bottle with a screw-threaded neck, a metal bottle cap with screw threads adapted to fit such neck, a central hole in said bottle cap, a rubber bulb protruding through said hole and having a flange surrounding the lower open end of the bulb to serve as the sole seal between the cap and the bottle, and to make the rubber member and the cap member unitary by means of friction or by other means (see prior art patents to Butz No. 586,011, July 6, 1897; Meier No. 590,708, September 28, 1897; and Deegan No. 1,-693,371 November 27, 1928).

49. There is no evidence that those who manufacture, use, or sell combined bottle closures and liquid droppers have any preference for the form of device shown and claimed in the patent in suit as compared with other forms of devices which are unitary but not within the claims of the patent in suit.

50. There is no evidence that the device shown and claimed in the patent in suit has had any more commercial success than other forms of unitary bottle closures and liquid droppers.

51. A substantial part of any commercial success of unitary bottle closures and liquid droppers is due to increased use and advertisement of dropper-applied medicaments having an oily base.

52. The license from plaintiff to Stanco, Inc., grants Stanco, Inc., a release from alleged past infringement and a royalty-free license for use of the patent in suit and an assignment of any future royalties from Vick Chemical Company and a pledge of suit by plaintiff against Vick Chemical Company or a retailer of its products, in return for a license under the Milburn patent No. 1,870,780 and the Bowman & Fentress patent No. 1,875,325.

53. Stanco, Inc., has made and sold combined bottle closures and liquid droppers substantially the same as plaintiff's patented structures, but has marked the same under the Milburn patent No. 1,870,-780 and not under the patent in suit.

54. For more than three years prior to the filing of the bill of complaint herein, plaintiff has caused notices charging the infringement of the patent in suit to be sent to alleged infringers, none of whom has ever been sued by plaintiff.

55. The alleged infringement herein consists in the defendant's sale, as a retailer, of Vick's nose drops or Va-tro-nol in packages containing one or another of the eight forms of combined bottle closure-liquid droppers shown by the drawing annexed to the stipulation of January 20, 1936, herein.

56. Plaintiff filed his original application after January 14, 1931, when Vick Chemical Company had commenced to publish newspaper advertisements showing a screw cap with a liquid dropper mounted therein and removed from the bottle as a unit.

57. Plaintiff filed his application for reissue of the patent in suit more than two years after the granting of the original Dykema Letters patent No. 1,843,812, and after the defendant had commenced to sell all its alleged infringing structures.

58. Of the alleged infringing structures shown by the stipulated drawing, the means by which the bulb and dropper are held within the cap in Nos. 1 and 4 is not friction, but the positive stop provided by the interference between the bulb flange and the constricted shoulder of the cap below that flange.

59. Of the alleged infringing structures shown by the stipulated drawing, the means by which the bulb and liquid dropper are held within the cap of Nos. 5, 6, 7, and 8 is not friction, but the positive stop provided by the interference between an enlarged bead above the cap opening and the upper surface of the cap above the central opening of the cap.

60. Of the alleged infringing structures shown by the stipulated drawing, Nos. 2 and 3 provide metal threads on the screw cap having a smaller inward diameter than the diameter of the rubber flange so that these structures would remain unitary even if no friction were present.

61. The original application for Dykema patent No. 1,843,812 as filed did not disclose or claim the alleged enhancement of engagement between the upper end of the glass dropper tube and the rubber member by means of the rubber flange.

62. The original application for Dykema patent No. 1,843,812 as filed did not disclose or claim a structure in which the upper end of the glass tube and the rubber member were connected by any other means than a groove in the inner surface of the rubber flange mating with a bead on the upper end of the dropper tube.

63. The original application for Dykema patent No. 1,843,812 as filed did not claim a structure in which there was any frictional engagement whatever between the cap and the flange of the bulb or any other part of the bulb, and did not claim that the dropper and cap were unitary.

64. The use of ephedrine in oil for nasal medicines was patented to Eli Lilly & Co., January 14, 1930, by United States Letters Patent No. 1,743,992 and by other United States patents issued during 1930, and these patents were dedicated to the public February 25, 1931.

65. No means was generally known for using ephedrine in oily medicine until about the spring of 1930 when these Lilly patents were issued.

66. The price of ephedrine has decreased from about $12 an ounce in 1929 to less than $1 an ounce at the present time.

67. The increased sale of oily nose drops since the early part of 1931 is due chiefly to the increased use of ephedrine since it became freed of patent restraint by Lilly's dedication of the oil ephedrine patents to the public.

68. The earliest documentary evidence which is alleged by plaintiff to refer to the plaintiff's alleged invention of the patent in suit is March 18, 1930, and the earliest alleged documentary disclosure thereof is a drawing dated July 30, 1930.

69. For approximately a year plaintiff owned also Milburn patent No. 1,870,780 and Bowman & Fentress patent No. 1,875,-325, and did not surrender or disclaim any part of either patent, but caused licenses to be granted thereunder and threats of suit to be made thereunder.

## Conclusions of Law.

1. Claims 2 to 9, inclusive, of the patent in suit, Dykema reissue patent No. 19,-520, are good and valid in law.

2. None of the claims is invalid by reason of the incorporation of "new matter."

3. None of the claims is invalid because of the lack of a supplemental oath.

4. Defendant's motion to strike Mr. Bristol's testimony is not well founded and should be denied.

5. The claims in suit do not define a mere aggregation, but a co-operative combination of elements.

6. The Milburn patent does not disclose the invention claimed by Dykema; hence the Patent Office was right in not declaring an interference between Milburn and Dykema.

7. Plaintiff was under no obligation to file a disclaimer in either the patent in suit or the Milburn patent in the absence of a judicial decision.

8. Failure to file a disclaimer in the Milburn patent could have no effect on the validity of the patent in suit, even if it be conceded that a disclaimer should have been filed in the Milburn patent.

9. Plaintiff could not in any event properly have filed a disclaimer in the Milburn patent because of Stanco's reversionary rights in the Milburn patent.

10. The claims in suit are fairly derivable from the disclosure of the original Dykema application.

11. The claims of the reissue patent in suit are for the same invention as disclosed and attempted to be claimed in the original Dykema application and patent.

12. No supplemental oath was required to support the amendment of claim 1 and the presentation of claims 2, 3, and 4 in the original Dykema application.

13. The claims in suit are properly verified by the reissue oath.

14. The patent in suit is a narrowing, not a broadening, reissue; therefore defendant is entitled to no intervening rights.

## Supplemental Opinion.

Four questions are raised concerning the form of the proposed decree herein. Each of such questions and the holding follow:

1. Whether the decree should hold claims 8 and 9 of the patent in suit to have been infringed by defendant's structure No. 2.

I hold that structure No. 2 infringes all claims, except claims 8 and 9. In my opinion rendered herein, an error appears on page 15 where it is recited that "defendant's structure No. 2 infringes 2 to 9, inclusive," etc. This latter statement is in conflict with the language of the opinion appearing on page 11.

2. Whether the accounting should commence from the date of the issue of the original patent in February, 1932, or at some later date.

Defendant contends that the accounting should be restricted to the period subsequent to the filing of the bill of complaint in 1935. I think that insufficient reasons are shown to justify the court in disallowing an accounting as of the date of the issuance of the patent. The defendant does not show laches within the rule, as laid down by the courts. It rather presents certain matters upon which it bases an equitable plea for the exercise of the discretion of the court in fixing some date later than the patent date.

I hold that the plaintiff is entitled to an accounting from the date of the issuance of the patent.

3. Whether the accounting should be restricted to defendant's structures Nos. 2 and 3 or should be directed to defendant's infringement generally.

As I understand, the parties have now agreed upon the form of the decree with respect to this question.

4. Whether plaintiff should recover his entire costs from defendant.

I hold, as I have advised counsel, that each party shall pay one-half of the costs.